STATE OF MINNESOTA

IN SUPREME COURT

A15-0251

Dakota County

Anderson, J.
Took no part, Chutich, J.

State of Minnesota,

Respondent,

vs.

Filed: July 6, 2016
Office of Appellate Courts

Shavelle Oscar Chavez-Nelson,

Appellant.

_____

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

James C. Backstrom, Dakota County Attorney, Kathryn M. Keena, Assistant County Attorney, Hastings, Minnesota, for respondent.

Charles F. Clippert, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      The district court erred when it denied appellant's request to have advisory counsel assume full representation of his case, but the error was harmless beyond a reasonable doubt.

2.      The district court did not commit errors that, either individually or cumulatively, deprived appellant of his right to a fair trial.

1

3.     Appellant was not prejudiced by the district court's refusal to instruct the jury on the lesser-included offense of first-degree manslaughter.

4.     Appellant's supplemental pro se claims are without merit.

Affirmed.

O P I N I O N

ANDERSON, Justice

Following a jury trial, appellant Shavelle Oscar Chavez-Nelson was found guilty of first-degree premeditated murder and second-degree intentional murder for the shooting death of Palagor Obang Jobi.  The district court convicted Chavez-Nelson of first-degree premeditated murder and sentenced him to life in prison without the possibility of release.  Chavez-Nelson now appeals his conviction directly to our court.  On appeal, Chavez-Nelson claims, among other arguments, that his Sixth Amendment right to counsel was violated; that the district court committed errors that, either individually or taken together, denied him a fair trial; and that the district court erred by refusing to instruct the jury on the lesser-included offense of first-degree manslaughter.  Because none of Chavez-Nelson's claims entitles him to relief, we affirm.

I.

At approximately 11:30 p.m. on September 21, 2013, Jobi went to Nina's Bar and Grill in Burnsville with two of his cousins, W.T. and M.T.; a friend, O.C.; and O.C.'s uncle.  Shortly before 1:00 a.m. on September 22, 2013, Chavez-Nelson arrived at Nina's with his girlfriend, A.C., and another woman.  Chavez-Nelson and the two women arrived in A.C.'s white Ford Fusion.

2

Just before 2:00 a.m., Jobi left the bar and stood outside the entrance to smoke a cigarette. A short time later, Chavez-Nelson and A.C. left Nina's so that A.C. could smoke a cigarette. During this time, A.C. stood on the sidewalk near Chavez-Nelson.

Several minutes later, Jobi told A.C. how beautiful she looked. Chavez-Nelson overheard the comment, became angry, and approached Jobi. Chavez-Nelson confronted Jobi and asked Jobi why he was talking to Chavez-Nelson's girlfriend. Jobi responded by stating something to the effect of, "If she's your girlfriend, why is she standing alone?" W.T. left Nina's at this time, observed the confrontation, and attempted to defuse the situation. Chavez-Nelson then walked down the sidewalk and stood with another group of people approximately 10 feet away.

After a short time, Chavez-Nelson left the group and walked toward Jobi. A.C. grabbed Chavez-Nelson by his arm and attempted to stop him from walking away, but Chavez-Nelson shook her off and continued to walk toward Jobi. Jobi then walked toward Chavez-Nelson. Chavez-Nelson and Jobi stood "squared up" on the sidewalk and argued with one another. Jobi then punched Chavez-Nelson in the face. After the punch, Chavez-Nelson spun away from Jobi and ended up standing on the sidewalk near the driver's side headlight of an SUV that was parked in front of Nina's.

A witness, R.C., who owned the SUV, was walking toward her car and unlocked it remotely. When R.C. opened her door, Chavez-Nelson pulled a gun out of his waistband and started shooting. Chavez-Nelson fired either two or three shots at Jobi, all of which missed. Jobi then ran along the passenger side and around the back of R.C.'s SUV.

When the shooting started, R.C. got into her car and hid. She testified that she saw someone run down the passenger side of her SUV. R.C. also testified that her SUV was shaking and that she assumed there was a struggle on the driver's side of her vehicle. R.C. then heard several additional shots and saw Jobi fall to the ground.

R.C. testified that there was a short pause between volleys as Jobi ran around her SUV and that there may have been a scuffle on the driver's side of her SUV in between the volleys. A.C. testified that there was an initial volley of two to three shots, followed by a short pause of three to four seconds, and then a second volley of shots. W.T. testified that once the shooting began, Chavez-Nelson fired between five and six shots, one after the other.[1]

W.T. dove to the ground on the passenger side of the SUV when the shooting started. After the shooting was over, W.T. ran around the SUV and saw Chavez-Nelson standing over Jobi, pointing a gun down at Jobi's body. W.T. tackled Chavez-Nelson and struggled with him. At some point during the struggle, the gun was fired again, and W.T. was able to slap the gun out of Chavez-Nelson's hand and onto the pavement. An unidentified individual then pulled W.T. off of Chavez-Nelson and told W.T. to let Chavez-Nelson go. Chavez-Nelson got up, picked up the gun, threatened M.T. and other bystanders with the gun, and fled the scene in A.C.'s vehicle.

When the police arrived, Jobi was lying face-down on the driver's side of R.C.'s SUV in a pool of his own blood. Jobi was declared dead at the scene. In all, the crime-

---

[1]     Another witness, J.H., testified that at least 15 seconds passed between the two volleys.

4

scene investigators determined that at least nine shots were fired. One bullet and one bullet fragment were located on the parking lot pavement directly under Jobi's head. The crime scene investigator identified four impact points from the bullets in the asphalt surface of the parking lot under Jobi's head.

Following an autopsy of Jobi's body, the medical examiner determined that Jobi had suffered eight gunshot wounds that were the cause of death. The medical examiner also determined that Jobi had a blood alcohol content of .26. Two of the gunshot wounds, one to the hip and one to the forehead, were front entry wounds. The medical examiner found six other entry wounds to the back of Jobi's body. Four of the back entry wounds were to Jobi's head, one was to his back just below his neck, and one was to his left shoulder.

Four of the back entry wounds, including three of the wounds to the back of Jobi's head, were compatible with a "shored wound." The medical examiner testified that the shored wounds were consistent with Jobi's body being in direct contact with the parking lot pavement at the time the bullets left his body. The prosecution argued that the trajectory of the back entry wounds and the fact that several of the back entry wounds were shored wounds indicated that Chavez-Nelson stood over Jobi's body when firing the six shots that produced back entry wounds. The medical examiner testified that the physical evidence was consistent with such a scenario, but also noted that he could not be certain that Jobi was on the ground when the back entry wounds were inflicted. The medical examiner was also unable to specify the chronological order of the gunshot wounds.

5

After viewing a photo lineup, both M.T. and R.C. identified Chavez-Nelson as the shooter. Further investigation revealed the relationship between A.C. and Chavez-Nelson. Subsequently, the police began performing surveillance on A.C.'s residence in Rosemount. During the surveillance, a police officer observed Chavez-Nelson getting into A.C.'s white Ford Fusion and driving it out of A.C.'s townhome complex. A fully marked squad car attempted to stop Chavez-Nelson, who initially pulled over, but then sped away, leading the police on a high-speed chase through a residential area.

Ultimately, Chavez-Nelson abandoned the vehicle and was apprehended on foot. A search of the area near where Chavez-Nelson was arrested revealed a 9-millimeter pistol, a magazine for a pistol, and a baseball cap. The pistol and magazine were submitted to the Bureau of Criminal Apprehension (BCA) lab for analysis. Testing by the BCA determined that all nine of the cartridge casings recovered from the scene of Jobi's shooting came from the pistol recovered at the scene of Chavez-Nelson's arrest. All of the bullets or bullet fragments recovered from the crime scene and autopsy were either fired by the pistol recovered at Chavez-Nelson's arrest or were not suitable for testing.

The BCA also conducted DNA testing on several items recovered from the crime scene and the scene of Chavez-Nelson's arrest. Blood found on the outside of a black ice-scraper mitten recovered from the crime scene matched Jobi's DNA profile and did not match Chavez-Nelson's or A.C.'s DNA profiles.

The pistol recovered from the scene of Chavez-Nelson's arrest was also tested for DNA. A DNA sample recovered from the grip of the pistol contained a mixture of four

6

or more individuals. Jobi and A.C. were both excluded as contributors, but Chavez-Nelson could not be. A DNA profile obtained from the trigger was a mixture of three or more individuals. Jobi and A.C. were excluded as contributors, but Chavez-Nelson could not be. Finally, a DNA profile obtained from the slide and magazine release was a mixture of four or more individuals. A.C. was excluded as a contributor, but Chavez-Nelson and Jobi could not be.

Chavez-Nelson was initially charged by complaint with second-degree intentional murder. *See* Minn. Stat. § 609.19, subd. 1(1) (2014). On October 24, 2013, a grand jury indicted Chavez-Nelson on charges of first-degree premeditated murder, *see* Minn. Stat. § 609.185(a)(1) (2014), and second-degree intentional murder, *see* Minn. Stat. § 609.19, subd. 1(1). After a jury trial, Chavez-Nelson was found guilty of all counts and sentenced to life in prison for the first-degree murder conviction. This appeal followed.

Chavez-Nelson raises a number of claims on appeal. In a brief submitted by his counsel, Chavez-Nelson argues that he was denied his Sixth Amendment right to counsel; that the district court made three evidentiary errors that, either individually or cumulatively, deprived him of a fair trial; and that the district court committed reversible error by declining to instruct the jury on the lesser-included offense of first-degree heat-of-passion manslaughter. Chavez-Nelson raises a variety of other claims in a pro se

supplemental brief.  We address the claims in Chavez-Nelson's principal brief first, followed by the claims in his pro se supplemental brief.[2]

## II.

Chavez-Nelson first claims that the district court deprived him of his right to counsel under the Sixth Amendment to the United States Constitution when it denied his request for advisory counsel to assume full representation of his case at trial.  After Chavez-Nelson was arrested, the district court determined that he was indigent and appointed two attorneys from the public defender's office to represent him.  The public defenders represented Chavez-Nelson through several pretrial motions, lengthy discovery, and a continuance that was granted in July 2014.  Chavez-Nelson never expressed dissatisfaction with the level of experience or the performance of his attorneys during this time.

Chavez-Nelson's trial was scheduled to begin on October 27, 2014.  On October 21, six days before trial, Chavez-Nelson informed the district court that he had discharged his appointed counsel and intended to retain private counsel.  At a hearing on October 23, Chavez-Nelson made an informal request for a continuance so that he would

---

[2]      Chavez-Nelson moved to strike two footnotes in the State's brief that, he contends, recite information that is not part of the record.  The motion is granted.  The record on appeal consists of the documents, exhibits, and transcript from the district court proceeding.  Minn. R. Civ. App. P. 110.01.  The State does not cite to the record to support the challenged content in the footnotes; nor does it explain why matters from outside the record are relevant to the issues on appeal.  *See Thiele v. Stich*, 425 N.W.2d 580, 582-83 (Minn. 1988) (stating that "[an] appellate court may not base its decision on matters outside the record on appeal"); *see also State v. Green*, 747 N.W.2d 912, 920 n.6 (Minn. 2008) (granting motion to strike portions of State's brief).

8

have additional time to find and secure private counsel. The district court denied Chavez-Nelson's request for a continuance, noting that the case had already been continued once.

Chavez-Nelson told the district court that he had discharged his public defense team because he disagreed with their decision not to call an expert witness to testify and because one of them had said that she "hated the way" Chavez-Nelson treated women. The district court determined that Chavez-Nelson's reasons for discharging his counsel did not meet the standard for "exceptional circumstances" contemplated by this court's precedent. *See State v. Clark*, 722 N.W.2d 460, 464-65 (Minn. 2006). Consequently, the district court informed Chavez-Nelson that it would not appoint new counsel to represent him and advised him that he could either retain his own attorney or proceed pro se.

Chavez-Nelson made some efforts to retain a private attorney between October 23 and the first day of trial on October 27, but he was ultimately unsuccessful. Before trial, the district court repeatedly offered to reappoint Chavez-Nelson's original public defenders to represent him. Chavez-Nelson declined these offers and indicated that he would rather proceed pro se. The district court determined that due to the "complexities and serious issues" in the case, it would appoint advisory counsel for Chavez-Nelson, as provided for by Minn. R. Crim. P. 5.04, subd. 2. The district court then appointed two attorneys who had no prior involvement with Chavez-Nelson's case to serve as advisory counsel.

Jury selection began on October 27 by having the jury fill out a detailed questionnaire. No jury questioning was conducted on October 27. On the morning of

9

October 28, before the start of voir dire, Chavez-Nelson asked that the district court order his advisory counsel to assume full representation of his case. The district court denied this request because it believed Chavez-Nelson was attempting to use the advisory-counsel mechanism to obtain substitute counsel after the district court had specifically ruled that he was not entitled to substitute counsel. Chavez-Nelson responded by directing the district court's attention to Minn. R. Crim. P. 5.04, subd. 2(2), which states that when advisory counsel has been appointed "because of concerns about delays in completing the trial, the potential disruption by the defendant, or the complexity or length of the trial," advisory counsel will assume full representation of the defendant if the defendant "requests advisory counsel to take over representation during the proceeding." Minn. R. Crim. P. 5.04, subd. 2(2)(b).

The district court indicated that allowing Chavez-Nelson to essentially obtain substitute counsel at the state's expense via the advisory-counsel rule would violate this court's ruling in *Clark* and it again denied Chavez-Nelson's request. But the district court reiterated that it would be willing to reappoint Chavez-Nelson's original public defenders at any time so that they could assume full representation of his case.

On the morning of October 30, after the first two days of voir dire, Chavez-Nelson indicated that he would be open to having his original counsel reappointed to represent him. The district court re-appointed Chavez-Nelson's attorneys from the public defender's office at the end of jury selection on October 31 and granted a short continuance to allow the reappointed attorneys an opportunity to prepare for trial.

10

Chavez-Nelson was fully represented by counsel for the remainder of trial, including during opening statements and the entirety of the trial testimony.

A.

We review the interpretation and application of the rules of criminal procedure de novo. *State v. Hugger*, 640 N.W.2d 619, 621 (Minn. 2002). Chavez-Nelson argues that the district court erred by denying his request for advisory counsel to assume full representation of his case. By contrast, the State argues that Chavez-Nelson's request was merely an attempt to obtain substitute counsel at the State's expense. As a result, the State reasons, the district court correctly characterized Chavez-Nelson's request as a motion for substitute counsel, which is subject to review for an abuse of discretion. *See Clark*, 722 N.W.2d at 464. Due to the timing of the request and the district court's finding that exceptional circumstances were not present, the State argues that the district court did not abuse its discretion by denying Chavez-Nelson's request for substitute counsel.

But the State's analysis does not fully address Chavez-Nelson's argument that Minn. R. Crim. P. 5.04, subd. 2, was violated. The State's position appears to be that, even though Chavez-Nelson made a request under Rule 5.04, subdivision 2, his request should simply be re-characterized as a request for substitute counsel. We reject the State's position.

The district court made the decision to appoint advisory counsel under Rule 5.04, subdivision 2(2). Even if Chavez-Nelson's request under Rule 5.04, subdivision 2(2), was merely an attempt to circumvent the district court's prior ruling on the issue of

substitute counsel, the district court was not free to disregard the text of the rule. Rule 5.04, subdivision 2(2), clearly requires the district court to inform the defendant that "advisory counsel will assume full representation of the defendant if the defendant . . . requests advisory counsel to take over representation during the proceeding." As a result, Chavez-Nelson had a rule-based right to request that his advisory counsel take over representation of his case, and the district court's denial of that request was an error.[3]

B.

Chavez-Nelson argues that the district court's error deprived him of representation during a crucial phase of the trial and resulted in a violation of his Sixth Amendment right to counsel. He claims that this error was structural and necessitates an automatic reversal. *State v. Dorsey*, 701 N.W.2d 238, 252-53 (Minn. 2005). The State, on the other hand, argues that even if there was a violation of Chavez-Nelson's right under Rule 5.04, subdivision 2(2), that error did not violate his Sixth Amendment right. As a result, the State argues, any error committed by the district court is subject to harmless-error analysis. *State v. Kuhlmann*, 806 N.W.2d 844, 850-51 (Minn. 2011) (noting that few errors are structural, and other constitutional errors are reviewed to determine whether they were harmless beyond a reasonable doubt).

---

[3]    Interestingly, had the district court appointed Chavez-Nelson's advisory counsel under Rule 5.04, subdivision 2(1), the district court may have had more discretion in determining whether Chavez-Nelson's advisory counsel would assume full representation of his case. *See* Minn. R. Crim. P. 5.04, subd. 2(1) (stating that a defendant's "decisions about the use of advisory counsel may affect a later request by the defendant to allow the advisory counsel to assume full representation").

Even though Chavez-Nelson had the right to have advisory counsel assume full representation of his case under Rule 5.04, subdivision 2(2), his Sixth Amendment right to counsel was not violated by the district court's decision to deny his request. Simply put, there is no constitutional right to advisory counsel. *Clark*, 722 N.W.2d at 466. Further, although a criminal defendant has a right to counsel, indigent criminal defendants do not have a right to a particular lawyer, only competent representation. *Id.* at 464. Generally, a defendant must "accept the attorney appointed by the court." *State v. Gassler*, 505 N.W.2d 62, 70 (Minn. 1993).

Here, although Chavez-Nelson did not receive the representation he desired— namely, representation by his advisory counsel—the district court repeatedly offered Chavez-Nelson the opportunity to accept the services of his original public defenders. Thus, although Chavez-Nelson was unrepresented during the jury selection process, he was unrepresented by his choice. Consequently, Chavez-Nelson's Sixth Amendment right to counsel was not violated in this case.

Because the district court's error was not a violation of Chavez-Nelson's constitutional right to counsel, we conclude that the error in this case does not fall into the " 'very limited class of' [structural] errors . . . that require automatic reversal of a conviction." *See Kuhlmann*, 806 N.W.2d at 851 (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)). Therefore, we apply the harmless-error test to Chavez-Nelson's claim. When applying that test, we must determine whether the defendant has shown that there is a reasonable possibility that the error significantly affected the verdict. *State v. Peltier*, 874 N.W.2d 792, 802 (Minn. 2016).

13

Because Chavez-Nelson argues that the error violated his Sixth-Amendment right to counsel and was structural error, he does not specify how the error may have prejudiced him. To the extent Chavez-Nelson maintains that he was prejudiced by the lack of counsel during the voir dire process, his claim fails. As discussed above, Chavez-Nelson always had the opportunity to be represented by counsel during all phases of the trial. Any lack of representation was due entirely to Chavez-Nelson's refusal to accept the services of his original public defenders. *Cf. Clark*, 722 N.W.2d at 464 (stating that an indigent defendant does not have a right to representation by a particular lawyer).

Indeed, if anything, it appears that Chavez-Nelson ultimately benefited from any error because, in the end, he was represented at trial by his original public defenders. Chavez-Nelson's original counsel had worked on the case for a full year and had vigorously litigated every aspect of the case. It is highly unlikely that Chavez-Nelson's advisory counsel, appointed on the first day of trial, would have provided better representation than Chavez-Nelson's original public-defense team. Therefore, we conclude that Chavez-Nelson suffered no prejudice as a result of the district court's error.

In summary, Chavez-Nelson had a rule-based right to request that his advisory counsel assume full representation of his case. The district court erred when it disregarded the text of Rule 5.04, subdivision 2(2)(b), and denied Chavez-Nelson's request that his advisory counsel assume full representation. But Chavez-Nelson's Sixth Amendment right to counsel was not violated, and the court's error was harmless. As a result, Chavez-Nelson is not entitled to relief on this claim.

14

III.

Chavez-Nelson next argues that three other errors committed by the district court, either individually or taken together, deprived him of a fair trial. We address each alleged error in turn.

A.

First, Chavez-Nelson argues that the district court erred when it refused to admit evidence regarding Jobi's reputation for violence. Decisions regarding the admissibility of evidence rest squarely within the discretion of the district court, and we review evidentiary decisions for an abuse of discretion. *State v. Profit*, 591 N.W.2d 451, 463 (Minn. 1999). An error regarding an evidentiary ruling is reversible only when it impacts the defendant's substantial rights. Minn. R. Evid. 103(a); Minn. R. Crim. P. 31.01. On appeal, the defendant bears the burden of establishing that the district court abused its discretion and that the evidentiary ruling prejudiced the defendant's substantial rights. *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003).

Evidence of a victim's reputation for violence is admissible in a self-defense case to establish that the victim was the initial aggressor. *State v. Penkaty*, 708 N.W.2d 185, 201 (Minn. 2006). When, however, there is no dispute regarding who was the initial aggressor, the probative value of the evidence is severely diminished and may be outweighed by the risk of unfair prejudice. *State v. Graham*, 292 Minn. 308, 313, 195 N.W.2d 442, 445 (1972).

Chavez-Nelson claimed that either M.T. or W.T. testified in a prior proceeding that Jobi had a history of getting into fights at bars. Additionally, Chavez-Nelson

15

believed that O.C. had testified that O.C. went back inside Nina's in order to avoid any trouble that Jobi was going to get into because Jobi had a history of getting into trouble at bars. Chavez-Nelson did not point to any specific prior testimony by M.T., W.T., or O.C. when arguing that evidence regarding Jobi's reputation for violence should be admitted.

After hearing argument from both sides, the district court concluded that the evidence was inadmissible because any probative value it had would be substantially outweighed by the risk of unfair prejudice. Once the district court ruled that the evidence would be inadmissible, Chavez-Nelson's counsel declined an opportunity to make an offer of proof or provide additional details regarding the testimony that would have been provided. The State argues that the district court did not commit an error because the facts were not in dispute.

The State is correct: the essential facts about the confrontation and the identity of the initial aggressor were undisputed. Every witness testified that the two men were engaged in a verbal confrontation and that Jobi threw the first punch, followed by Chavez-Nelson escalating the situation by introducing a firearm. As a result, the probative value of evidence that Jobi had a reputation for violence was very limited.[4]

Chavez-Nelson argues that although the order of physical aggression was undisputed, it was unclear who started the verbal confrontation. To the extent that is true,

---

[4]     If the defendant is aware of the victim's reputation for violence, evidence of that reputation is admissible to show that the defendant's apprehension of bodily harm was reasonable. *See Penakty*, 708 N.W.2d 202. But Jobi and Chavez-Nelson were unknown to each other and thus the evidence was only admissible to show that Jobi was the initial aggressor. *See id.* at 201.

16

the probative value of evidence establishing who started the verbal confrontation as it relates to Chavez-Nelson's self-defense argument is limited. Regardless of who started the verbal confrontation, it is uncontroverted that Jobi started the physical altercation and that Chavez-Nelson escalated the encounter by introducing a firearm. Although the reputation evidence may have been relevant for the purpose of establishing who started the verbal altercation, such evidence would have had limited probative value given the undisputed evidence that Jobi was the initial physical aggressor. Evidence regarding who started the verbal confrontation would have added little, factually or legally.

As a result, the district court determined that there was a high risk of undue prejudice and that the risk of undue prejudice substantially outweighed any probative value of the evidence. Given the limited probative value of the evidence, the uncontested nature of the facts surrounding the physical altercation, and the high risk of unfair prejudice, the district court did not abuse its discretion by excluding evidence of Jobi's reputation for violence.

## B.

Second, Chavez-Nelson argues that the district court improperly admitted testimony regarding a firearm trace that the Bureau of Alcohol, Tobacco, Firearms & Explosives conducted on the murder weapon. The prosecutor elicited testimony from one of the investigating officers regarding the original purchase of the weapon, including where and when it was purchased. The witness then testified that he was not able to determine how Chavez-Nelson came to possess the murder weapon.

17

Chavez-Nelson did not object to the firearm-trace evidence at trial. When the defendant does not object to the alleged error in the district court, the error is subject to plain-error review. *State v. Pearson*, 775 N.W.2d 155, 161 (Minn. 2009). In order to satisfy the plain-error test, the defendant must show (1) an error, (2) that the error was plain, and (3) that the error impacted the defendant's substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). If those three prongs are met, we must determine whether to address the error to ensure the fairness and integrity of the judicial process. *Id.*

In order to establish that there was an error in this context, Chavez-Nelson must show that the district court abused its discretion by admitting the evidence. *State v. Mosley*, 853 N.W.2d 789, 797 (Minn. 2014). Chavez-Nelson argues that the evidence was inadmissible because it was irrelevant and suggests that he obtained the firearm illegally. The evidence at issue was arguably relevant because it helped to establish the origin of the murder weapon. But Chavez-Nelson is correct that the State was not required to prove any elements related to the origins of the firearm or whether it was in the possession of its registered owner at the time of the shooting. Thus, the probative value of the evidence was low.

At the same time, however, the evidence was not highly prejudicial. The witness never testified that Chavez-Nelson obtained the firearm illegally, and the witness made it clear that he did not know how Chavez-Nelson came to possess the firearm. Given the marginal relevance of the firearm trace evidence, its admissibility is a close question, but we cannot say that the district court abused its discretion by admitting it. Additionally,

18

even if the district court did commit an error, it certainly did not rise to the level of a plain error. *See Gulbertson v. State*, 843 N.W.2d 240, 247 (Minn. 2014) ("A plain error is one that is clear or obvious . . . ."). As a result, Chavez-Nelson is not entitled to relief on his claim regarding the firearm-trace evidence.

C.

Third, Chavez-Nelson argues that the district court erred when it denied his motion for a mistrial based on A.C.'s statement that Chavez-Nelson had abused her. When A.C. was asked whether she was aware that Chavez-Nelson owned a handgun prior to the night of the murder, she responded, "The first time I had seen his gun was *after he had abused me*." (Emphasis added.) The defense objected, a sidebar was held, and the district court took a short recess. Upon returning, the district court sustained the objection, struck the question and answer from the record, and instructed the jury to disregard the statement.

This series of events was immediately followed by a lunch recess. During the jury's lunch break, the district court heard arguments on Chavez-Nelson's motion for a mistrial. The district court characterized A.C.'s statement as an "outburst," denied the motion, and offered to read a further curative instruction after the jury returned.

We review a district court's decision to deny a mistrial for an abuse of discretion. *State v. Spann*, 574 N.W.2d 47, 52 (Minn. 1998). "[A] mistrial should not be granted unless there is a reasonable probability that the outcome of the trial would be different." *State v. Manthey*, 711 N.W.2d 498, 506 (Minn. 2006) (quoting *Spann*, 574 N.W.2d at 53).

19

In this case, the district court did not abuse its discretion by denying Chavez-Nelson's motion for a mistrial for several reasons. First, the statement at issue was an isolated incident. Chavez-Nelson identifies only one short statement in a lengthy trial that produced over 1,400 pages of transcript. *See State v. Bahtuoh*, 840 N.W.2d 804, 819-20 (Minn. 2013) (stating that the district court did not abuse its discretion by denying a motion for a mistrial based on an isolated incident where the State introduced evidence that the defendant was present at the scene of another shooting that occurred the same night as the murder with which he was charged); *State v. Mahkuk*, 736 N.W.2d 675, 689 (Minn. 2007) (stating that the district court did not abuse its discretion by denying a motion for a mistrial when the defendant was able to identify only one isolated incident comprised of two words in a 1,000-page transcript). Additionally, the district court sustained the objection made by the defendant's trial counsel and specifically ordered the jury to disregard the testimony. *See Mahkuk*, 736 N.W.2d at 689 (stating that the district court did not abuse its discretion by denying a motion for a mistrial after it sustained the defense's objection and gave a curative instruction).

Further, as the State observes, Chavez-Nelson's defense team went out of their way to prepare the jury for the fact that Chavez-Nelson was not a likeable individual. Chavez-Nelson's counsel told the jury that Chavez-Nelson was a womanizer and had committed "really bad acts," among other things, and that the jury would probably not like him. Given this background, it is unlikely that such a brief statement would have swayed the jury and changed the outcome of the trial.

Finally, the State's overall case against Chavez-Nelson was strong. *See Bahtuoh*, 840 N.W.2d at 819-20 (considering the strength of the State's evidence when determining whether the district court abused its discretion by denying a motion for a mistrial). It was uncontested that Chavez-Nelson pulled a gun out of his waistband after being struck by Jobi and that he fired at least nine shots during the course of the confrontation. Chavez-Nelson did not testify at trial, and he offered no evidence or witnesses refuting the fact that he shot Jobi. In fact, Chavez-Nelson's theory of the case was based almost entirely on self-defense. The medical and forensic evidence, including the impact points below Jobi's head, indicated that Jobi was shot in the head multiple times and that he was likely lying on the ground when some of those shots were fired. When all of these factors are considered together, it is very unlikely that A.C.'s brief and ambiguous statement influenced the outcome of the trial. As a result, the district court did not abuse its discretion when it denied Chavez-Nelson's motion for a mistrial.

D.

Finally, Chavez-Nelson argues that all three of these errors, taken together, deprived him of a fair trial. *See State v. Davis*, 820 N.W.2d 525, 538-39 (Minn. 2012). Because we conclude that the district court did not err in any of the instances Chavez-Nelson directs us to, Chavez-Nelson's cumulative-error claim fails. None of the district court's alleged errors, individually or taken together, deprived Chavez-Nelson of a fair trial.

IV.

The final argument in Chavez-Nelson's principal brief is that the district court erred by refusing his request to instruct the jury on the lesser-included offense of first-degree heat-of-passion manslaughter. *See* Minn. Stat. § 609.20(1) (2014). A defendant is entitled to an instruction on a lesser-included offense when, viewing the evidence in the light most favorable to the defendant, there is a rational basis to acquit the defendant of the more severe charge and find the defendant guilty of the lesser-included charge. *State v. Dahlin*, 695 N.W.2d 588, 597 (Minn. 2005). We review a district court's decision not to provide a lesser-included-offense instruction for an abuse of discretion. *Id.* But, if the evidence warrants a lesser-included instruction, the instruction must be given. *Id.* An erroneous failure to give a lesser-included instruction is reversible error only when the defendant is prejudiced by the error. *Id.*

Heat-of-passion manslaughter is a lesser-included offense of first-degree premeditated murder. *State v. Hannon*, 703 N.W.2d 498, 509 (Minn. 2005). But we have previously held that a defendant is not prejudiced by a failure to instruct on heat-of-passion manslaughter when the jury is presented with a charge of first-degree premeditated murder and a charge of second-degree intentional murder and finds the defendant guilty of first-degree premeditated murder. *Cooper v. State*, 745 N.W.2d 188, 194 (Minn. 2008). We reasoned:

> Because the jury had the choice of finding [the defendant] guilty of intentional murder *without* premeditation (i.e., second-degree murder), but instead found [the defendant] guilty of intentional murder *with* premeditation, this verdict indicates that the jury would not have found [the

22

defendant] guilty of first-degree manslaughter, which requires an intent triggered by the heat of passion but no premeditation.

*Id.*

This case is analogous to *Cooper.* The jury was presented with charges of first-degree premeditated murder and second-degree intentional murder. The jury's decision to find Chavez-Nelson guilty of first-degree premeditated murder demonstrates that the jury would not have acquitted Chavez-Nelson of first- and second-degree murder and instead found him guilty of first-degree manslaughter. Consequently, Chavez-Nelson was not prejudiced by any error in the district court's refusal to instruct the jury on the lesser-included offense of first-degree heat-of-passion manslaughter and is not entitled to relief based on this claim.

V.

In addition to the arguments presented through counsel, Chavez-Nelson made a number of claims in a supplemental pro se brief. Chavez-Nelson argues that (1) the district court's instructions to the jury regarding self-defense and premeditation were incorrect, (2) the district court erred by denying his motion for acquittal, (3) the prosecutor committed misconduct during closing argument, (4) the prosecutor committed misconduct by seeking to admit the firearm-trace evidence, (5) the district court erred by admitting evidence of Chavez-Nelson's flight from police, (6) errors were committed in the selection of the jury, (7) his conviction for first-degree premeditated murder is invalid because the jury foreperson signed the verdict form for the second-degree murder count before signing the verdict form for the first-degree murder count, and (8) his trial counsel

23

was ineffective. We have carefully considered each of Chavez-Nelson's pro se arguments and, after a thorough review of the record and case law relevant to these arguments, we conclude that none of Chavez-Nelson's pro se claims has merit.

VI.

Ultimately, we conclude that Chavez-Nelson is not entitled to relief based on any of the claims that he has raised. Chavez-Nelson's Sixth Amendment right to counsel was not violated, and any violation of his rule-based right to have advisory counsel assume full representation of his case was harmless. The district court did not commit errors that, either individually or taken together, deprived Chavez-Nelson of a fair trial. Chavez-Nelson was not prejudiced by the district court's refusal to instruct the jury on the lesser-included offense of first-degree manslaughter. Finally, Chavez-Nelson's pro se claims lack merit. Therefore, we affirm Chavez-Nelson's conviction for first-degree premeditated murder for the shooting death of Palagor Obang Jobi.

Affirmed.

CHUTICH, J., not having been a member of the court at the time of submission, took no part in the consideration or decision of this case.