ANDERSON, Justice.
A Hennepin County jury found appellant Gonzalo Galvan guilty of two counts of first-degree premeditated murder for the shooting deaths of his long-time girlfriend, Eugenia Tallman, and Tallman's 15-year-old daughter, Victoria Alvarez. The district court convicted Galvan of first-degree premeditated murder and imposed consecutive life sentences. At trial, Galvan admitted shooting the victims but argued that the murders were not premeditated. Galvan also sought a jury instruction on first-degree heat-of-passion manslaughter. The court declined to give the instruction, citing a "vacuum of evidence" to support the instruction.
In this direct appeal, Galvan contends that the State failed to present evidence at trial sufficient to establish premeditation and that the district court committed reversible error by declining to instruct the jury on first-degree heat-of-passion manslaughter. Because we conclude that the State presented sufficient evidence to sustain Galvan's convictions and that Galvan was not prejudiced by the district court's decision to not instruct the jury on first-degree heat-of-passion manslaughter, we affirm.
FACTS
At 5:11 p.m., on September 25, 2015, Galvan called 911 and told the dispatcher that he had "shot [his] family." Galvan said that he was "giving up" and that his son was alive. Galvan told the dispatcher that he was not armed and that the gun would "be in the trash container." Galvan also *666 said that Tallman had threatened to take away his son. He hung up the phone after telling the dispatcher that his son needed help going to the bathroom. Four minutes later, Galvan called 911 again. He asked that the police not shoot him or his son and reiterated that he was not armed.
Police responded to the front and rear of the house. Three officers arrived from the rear of the property, proceeding over a fence, across the backyard, and onto the back porch. Once through the back-porch door and the inside door to the home, the officers discovered Tallman. Her body was face down on the floor, her head toward the porch and her feet toward the kitchen. Entering the kitchen, the officers discovered Alvarez. Her body was on her right side, on the floor, against the kitchen cabinets and her head was against the refrigerator. The officers observed gunshot wounds to both Tallman's head and Alvarez's head and quickly determined that the victims were dead.
Standing in the kitchen, officers observed Galvan in the living room, looking out the front window and talking on the phone. Galvan was barefoot, dressed in only athletic shorts and a sleeveless shirt. M.G., the seven-year-old son of Galvan and Tallman, was sitting a few feet from Galvan.
Officers in the front of the house shouted commands for Galvan to come outside of the house. Galvan opened the door, stepped outside, dropped the cell phone from his hand, and walked down the stairs. While several officers took Galvan into custody, another officer entered the front of the house, picked up M.G., and carried him to a squad car.
Galvan was unharmed. The police found no weapons on the victims. There was no sign of a struggle or physical altercation between the victims and Galvan.
Officers recovered a Smith & Wesson, semiautomatic, 9-millimeter handgun from the wastebasket in the kitchen. One round was in the chamber and three rounds were in the magazine, which had a 16-round capacity. Ultimately, police identified 11 bullets and 12 discharged cartridge casings. A magazine holder was found on a shelf in the basement stairwell, which contained another magazine loaded with 16 rounds.
Tallman had been shot twice in the back of the head. One shot entered the back, lower-left side of her head and exited the right side of her head. The other shot entered the back, right side of her head, traveled slightly upward, and exited the right side of her forehead. Blood splatter on the door separating the kitchen and the back porch was consistent with Tallman having ducked before Galvan shot her. Each shot would have been incapacitating and ultimately fatal.
When Galvan murdered her, Tallman was wearing a backpack. Inside were bus schedules, receipts, hair ties, bus tickets, M.G.'s school paperwork, a child's drawing, underwear for a young male, and a purse and wallet containing identification and medical cards for Tallman, Alvarez, and M.G. Close to her hands were a set of keys, a child's bottle, and a second backpack. The position of these items was consistent with Tallman having held them in her hands when Galvan shot her.
Tallman had a plastic bag containing several envelopes of cash, totaling $21,800, under her bra. The second backpack had a nametag with M.G.'s name on it and contained school folders, a sweatshirt, pants, t-shirts, and underwear.
Galvan shot Alvarez six times: once in the head, three times on the right side of her chest, once in the abdomen, and once in the right hip. Stippling patterns around bullet wounds to Alvarez's forehead, hand, *667 and chest were consistent with Galvan having fired those shots from one-half inch to three feet away. An imprint of concentric circles around the bullet wound to Alvarez's forehead suggested that the muzzle of the handgun had touched her forehead, although the medical examiner did not determine the head shot to be a contact wound. A graze injury to Alvarez's left hand corresponded to the wound to her forehead, consistent with Alvarez having raised her arms in front of her face just before Galvan shot her in the forehead.
The position of Alvarez's head, leaning against the refrigerator, and the pooling and splatter of blood around her body, were consistent with Galvan having shot her in the forehead last. A DNA analysis of blood recovered from Galvan's foot produced a match to Alvarez. Blood on Alvarez's wrist was consistent with Galvan at some point having stepped on Alvarez's arm. Further, the stippling on her skin and location of the wounds in different areas on her body indicated that Galvan approached Alvarez as he shot her.
Alvarez was fully clothed, wearing a backpack and one shoe. The backpack contained school papers, a school schedule, school supplies, a book, and a laptop computer. In the living room, officers found a sweatshirt, a duffel bag, and Alvarez's other shoe all next to each other on the floor. The duffel bag contained a power cord and clothes.
In the kitchen, officers observed a bullet hole in the kitchen window and a corresponding hole in a makeshift storage tent in the backyard. Another bullet hit the bottom of the kitchen cabinet directly across from the doorway to the living room. That bullet traveled to the right and upward through the bottom edge of the front of the cabinet and lodged underneath the cabinet. Another bullet traveled through the half-door between the living room and the kitchen, through the wall between the kitchen and the living room, and into the washing machine behind the wall. That trajectory was consistent with the half-door having been open and the shot having been fired from the top of the basement stairwell.
After Alvarez's body was moved, another bullet hole in the floor was discovered. Officers recovered the bullet from the crawlspace below the kitchen. Police recovered two more bullets from the floor around Tallman's body. Finally, there was a bullet hole in the back-porch screen door.
Surveillance cameras installed on the outside of the house recorded the front and backyards. In the living room, a television displayed the video feed from the four cameras. A forensic video analyst was able to recover video of the day of the murders. Alvarez left for school around 7:03 a.m. A few minutes before 8 a.m., Galvan went out the front door to the sidewalk and walked in front of a neighboring house to talk to a neighbor. A few minutes later, Galvan returned to the inside of the house and remained there until after the murders, when he surrendered to police.
Around 4:20 p.m., Tallman went out to the backyard. Alvarez and M.G. joined her shortly afterward. Tallman and M.G. played with a ball for a few minutes before M.G. went back inside the house. Tallman and Alvarez remained in the backyard for several minutes and discussed something. Both Tallman and Alvarez then went back inside the house.
At 5:07 p.m., Tallman went out the back door into the backyard. She was carrying a backpack. She placed something under her shirt and bra and walked away from the house. Tallman put the backpack on, stopped, turned around, and waited, looking at the house. After about one minute, Tallman walked quickly back toward the *668 house and onto the porch. Galvan called 911 about three minutes later.
The State argued to the jury that Galvan knew that Tallman, Alvarez, and M.G. were leaving sometime after they returned inside the house from the backyard around 4:27 p.m, whether as a result of a previous argument, because Tallman and Alvarez were packing to leave, or because Tallman had taken the money. After Tallman left the house, placed the money under her bra, and then went back into the house, she grabbed the other backpack, her keys, and the child's bottle.
During this time, the State contends, Galvan retrieved the handgun from somewhere in the house because he was not wearing clothes with pockets in which he could carry a handgun. According to the State, the magazine found in the stairwell to the basement, which enters into the kitchen, suggested that Galvan retrieved the gun from the basement or the stairwell, and entered the kitchen, firing. As Galvan raised the handgun and fired, Tallman moved toward the back porch and ducked by the door. Galvan then fired at least four shots as he moved toward Tallman. Two of the shots struck her in the head and at some point she fell to the floor. The different trajectories of the bullets that struck Tallman's head indicate that one shot hit her while she was ducking and the other hit her after she had fallen.
According to the State, Alvarez was in the living room, putting on her shoes, when she heard the commotion in the kitchen and ran to her mother. When Alvarez entered the kitchen, Galvan shot her five times. Then, as Alvarez lay against the kitchen cabinets, she raised her hands to protect herself as Galvan approached and shot her in the forehead. Galvan then called 911.
Galvan admitted shooting Tallman and Alvarez. Galvan argued to the jury that he did not premeditate the murders; rather, the killings were a rash, unconsidered decision. Further, Galvan contended that the anguish and regret in his voice when he called 911 demonstrated that he did not intend to kill Tallman and Alvarez. Galvan also sought a jury instruction on first-degree heat-of-passion manslaughter. The district court denied the requested instruction based on a lack of evidence.
The jury found Galvan guilty of two counts of first-degree premeditated murder. The district court convicted Galvan and sentenced him to consecutive terms of life in prison without the possibility of release. See Minn. Stat. § 609.106, subd. 2(1) (2016).
ANALYSIS
Galvan makes two arguments on appeal. First, he contends that the evidence admitted at trial was insufficient to support the jury's finding of premeditation. Second, he argues that the district court committed reversible error by declining to instruct the jury on first-degree heat-of-passion manslaughter.
I.
We begin with Galvan's first argument. When we review a claim of insufficient evidence, "we view the evidence in the light most favorable to the verdict and assume that the fact finder disbelieved any contrary evidence." State v. Kendell , 723 N.W.2d 597, 605 (Minn. 2006).
When the jury's verdict rests on circumstantial evidence, "we conduct a two-step analysis." State v. Anderson , 789 N.W.2d 227, 241 (Minn. 2010). First, we "identify the circumstances proved, giving deference to the jury's acceptance of the proof of these circumstances and rejection of" conflicting evidence. Id. at 241-42 (citation *669 omitted) (internal quotation marks omitted). Second, we examine "the reasonableness of all inferences that might be drawn from the circumstances proved, including inferences consistent with a hypothesis other than guilt." Id. at 242 (citation omitted) (internal quotation marks omitted). We do not overturn convictions based on circumstantial evidence on conjecture alone, and our review "consists of determining whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." Id.
A person who intentionally and with premeditation "causes the death of another human being" is guilty of first-degree murder. Minn. Stat. § 609.185(a)(1) (2016). " 'Premeditation' means to consider, plan or prepare for, or determine to commit, the act prior to its commission." Minn. Stat. § 609.18 (2016). To establish premeditation, the State must demonstrate that " 'some appreciable time' " passed between the "formation of intent" and the killing. State v. Palmer , 803 N.W.2d 727, 734 (Minn. 2011) (quoting State v. Moore , 481 N.W.2d 355, 361 (Minn. 1992) ). "But proving premeditation does not require proof of extensive planning or preparation to kill, nor does it require any specific period of time for deliberation." Id. (citation omitted); see also State v. Goodloe , 718 N.W.2d 413, 422 (Minn. 2006) ("[E]ven a 'short period of time' constitutes 'some appreciable time.' ").
Our precedent recognizes generally three categories of evidence "as relevant to an inference of premeditation: planning activity, motive, and the nature of the killing." State v. Hughes , 749 N.W.2d 307, 313 (Minn. 2008). "Planning activity relates to facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing." Anderson , 789 N.W.2d at 242 (citation omitted) (internal quotation marks omitted). Proof of motive is not necessary to a finding of premeditation, but motive evidence "strengthen[s] a finding that the defendant deliberated about the killing." Id. The nature of the killing also can support an inference of premeditation when it "was so particular and exacting that the defendant must have intentionally killed [with] a preconceived design." State v. McArthur , 730 N.W.2d 44, 50 (Minn. 2007). "This third type of evidence includes the number of wounds inflicted, infliction of wounds to vital areas, [and] infliction of gunshot wounds from close range." Id. For example, we have held that a single shot to "the back can support a finding of premeditation because it indicates that the shooter took careful aim at the victim." Kendell , 723 N.W.2d at 607. We consider the circumstances proved regarding each of the three categories of evidence.
A.
As to planning activity, the inference that Galvan retrieved the weapon from somewhere, and perhaps even retrieved the ammunition from elsewhere, strongly supports a finding of premeditation because it establishes that an appreciable period of time passed between when Galvan decided to kill and when he actually killed Tallman and Alvarez. See McArthur , 730 N.W.2d at 50 (relying on the inference that the defendant retrieved the murder weapon within a few hours before the murder); State v. Clark , 739 N.W.2d 412, 422-23 (Minn. 2007) (relying on the fact that the defendant brought the murder weapon to the scene of the murder as strong evidence of premeditation); State v. Austin , 332 N.W.2d 21, 25 (Minn. 1983) (relying on the fact that the defendant walked up a set of stairs before shooting the victim as evidence of premeditation).
*670 Galvan was dressed only in athletic shorts and a sleeveless t-shirt. A magazine holder containing a loaded magazine was found on a shelf in the stairwell to the basement. One bullet travelled through the half-door between the living room and the kitchen. That half-door is directly next to the door between the kitchen and the basement stairwell. The bullet wounds to Alvarez's body were consistent with a firing distance of several feet away and the bullet wound to her forehead was consistent with a firing distance of merely a few inches.
All reasonable inferences to be drawn are consistent with planning activity, supporting the jury's finding of premeditation. Those reasonable inferences include, but are not limited to, the retrieval of the handgun, the magazine holder, or both by Galvan from either the basement or the stairwell to the basement. Further, the bullet hole in the half-door and the trajectory of the bullet lodged in the kitchen cabinet indicate that Galvan fired while and after moving up the stairs and into the kitchen. Whatever amount of time it took Galvan to retrieve the gun or ammunition, it was certainly "appreciable." See Palmer , 803 N.W.2d at 739 (quoting Moore , 481 N.W.2d at 361 ); State v. Merrill , 274 N.W.2d 99, 112 (Minn. 1978) (holding that defendant's admission that he retrieved a knife from the kitchen before stabbing his victim to death supported jury's finding of premeditation). Additionally, the nature of Alvarez's wounds indicate that Galvan approached her as he fired, evincing an appreciable period of time between when Galvan started firing and when he fired the fatal shot to Alvarez's forehead.
In sum, not only do the circumstances proved support a reasonable inference that an appreciable period of time transpired between when Galvan decided to kill and when he actually killed Tallman and Alvarez, but also they are inconsistent with a reasonable inference that Galvan acted in a rash and unconsidered manner. See McArthur , 730 N.W.2d at 50 (relying on the inference that the defendant retrieved the murder weapon within a few hours before the murder); Clark , 739 N.W.2d at 422-23 (relying on the fact that the defendant brought the murder weapon to the scene of the murder as strong evidence of premeditation); Austin , 332 N.W.2d at 25 (relying on the fact that the defendant walked up a set of stairs as evidence of premeditation).
B.
Evidence of motive, although not required, also may support premeditation. Anderson , 789 N.W.2d at 242. Here, there was substantial evidence of Galvan's motive to kill Tallman. Tallman was the sole source of their family's income. Tallman told Galvan that she was leaving him and that the children were going with her. Tallman, Alvarez, and M.G. had belongings, clothes, and important documentation packed in backpacks or bags, demonstrating an imminent intent to depart. Tallman had $21,800 in cash in envelopes on her person, and Galvan was aware that Tallman was taking the money. Further, Tallman told Galvan that she was taking M.G. away from him.
Galvan's motive to kill Tallman was clear. When asked why he did it, Galvan said that it was because Tallman was taking M.G. The circumstantial evidence is consistent with this direct evidence of Galvan's stated motive. Considering the facts as a whole-the backpacks, Tallman's keys, the $21,800 in cash, Tallman waiting outside and returning, among other facts-the only reasonable inference to be drawn is that Galvan shot and killed Tallman because she was leaving Galvan and their home. This motive evidence supports a finding of premeditation regarding Tallman. See *671 State v. Pendleton , 759 N.W.2d 900, 909-910 (Minn. 2009) (relying on evidence that the defendant and the victim had fought and had a "rocky relationship" in finding motive in support of premeditation); State v. Lodermeier , 539 N.W.2d 396, 398 (Minn. 1995) (relying on evidence that the relationship between the defendant and the victim "had deteriorated" in finding motive in support of premeditation).
C.
The nature of the killing of both Alvarez and Tallman is also consistent with Galvan having premeditated the murder of both victims. The manner and brutality of the murders support the jury's finding of premeditation because it shows that Galvan aimed for vital parts of Tallman's body and Alvarez's body and repeatedly fired. See Lodermeier , 539 N.W.2d at 398 (relying in part on the nature of the wounds to support a finding of premeditation); State v. Martin , 261 N.W.2d 341, 345 (Minn. 1977) (noting that the brutality of a killing might not alone "be sufficient evidence of premeditation" but it could "be considered by the jury as supporting an inference that defendant premeditated to act"); State v. Hare , 278 Minn. 405, 154 N.W.2d 820, 822 (1967) (holding that aiming a firearm at a victim and firing multiple shots that hit the victim support an inference of premeditation). Galvan shot Tallman twice in the back of the head. The evidence establishes that both wounds to Tallman's head were incapacitating and ultimately fatal. The bullets traveled through Tallman's brain on different trajectories. The blood spatter on the door between the back porch and the laundry area was consistent with Galvan shooting Tallman as she was ducking.
Galvan's shot, at very close range and directly to Alvarez's forehead, was fatal. There was stippling on some wounds but not others, showing that Galvan approached Alvarez as he fired. The graze wound to Alvarez's left hand and stippling on her right wrist correspond to the wound on her forehead, indicating that she had her hands in a defensive position when Galvan shot her in the head. The concentric circles around the wound to Alvarez's head show that the muzzle of the gun touched her forehead. The blood spatter on the floor indicates that Alvarez's head came to rest on the refrigerator after Galvan shot her in the head. The wounds to Alvarez's hands and the blood spatter and pooling on the ground show an execution-style killing. See State v. Gray , 456 N.W.2d 251, 259 (Minn. 1990) ("[A]n execution-type killing ... is a clear example of premeditated murder.").
In sum, the circumstances proved, when considered together, are consistent with a reasonable inference that Galvan premeditated each murder. Further, the circumstances proved are inconsistent with a reasonable inference that Galvan rashly committed the murders intentionally, but not with premeditation.[1] See State v. Al-Naseer , 788 N.W.2d 469, 473 (Minn. 2010) ("Circumstantial evidence must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt."). We therefore hold that the evidence is sufficient to support Galvan's convictions for first-degree premeditated murder.
II.
Galvan's second argument is that the district court committed reversible *672 error by declining to instruct the jury on first-degree heat-of-passion manslaughter. See Minn. Stat. § 609.20(1) (2016). In considering a request for an instruction on a lesser-included offense, a district court must look at the evidence "in the light most favorable to the party requesting the instruction." State v. Dahlin , 695 N.W.2d 588, 598 (Minn. 2005). If the evidence warrants a lesser-included-offense instruction, a district court must instruct the jury. Id. at 597 ; see State v. Hannon , 703 N.W.2d 498, 509 (Minn. 2005). Further, "the failure to submit lesser-included offenses to the jury is grounds for reversal only if the defendant is prejudiced thereby." Dahlin , 695 N.W.2d at 598 (quoting State v. Shepherd , 477 N.W.2d 512, 516 (Minn. 1991) ). Because we conclude that Galvan was not prejudiced by the district court's decision not to submit the requested instruction to the jury, it is not necessary to decide whether the district court erred in its decision.
A.
We have held that a district court's failure to give a heat-of-passion manslaughter charge to the jury does not prejudice a defendant when the jury is presented with second-degree intentional murder and first-degree premeditated murder and finds the defendant guilty of first-degree premeditated murder. State v. Chavez-Nelson , 882 N.W.2d 579, 591 (Minn. 2016) ; Cooper v. State , 745 N.W.2d 188, 194 (Minn. 2008). This case is analogous to Cooper and Chavez-Nelson . The district court instructed the jury on second-degree intentional murder and first-degree premeditated murder. The jury found Galvan guilty of two counts of first-degree premeditated murder for killing Tallman and Alvarez. Because the jury found Galvan guilty of intentional murder with premeditation, the jury could not have found Galvan "guilty of first-degree manslaughter, which requires an intent triggered by the heat of passion but no premeditation ." Cooper , 745 N.W.2d at 194 (emphasis added); see also 2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law §§ 7.7(a), 7.10(a) (1986) (explaining that the mental states of premeditation and heat of passion are mutually exclusive).
Galvan argues that Cooper and Chavez-Nelson were wrongly decided and that we should not apply them here.[2] Galvan relies on State v. Auchampach , a case in which we considered whether the jury instructions adequately informed the jury of the burden of proof concerning the elements of first-degree premeditated murder and first-degree heat-of-passion manslaughter. 540 N.W.2d 808, 814-18 (Minn. 1995). In Auchampach , the defendant requested a jury instruction that explicitly informed the jury that the State had to prove beyond a reasonable doubt that the defendant did not act in the heat of passion. Id. at 814. Although the district court denied the request, the court did instruct the jury on first-degree heat-of-passion manslaughter. Id. The defendant brought *673 a due process challenge, arguing that the instruction impermissibly shifted the burden of proof to the defendant. Id. at 816. We held that the State had the burden to prove beyond a reasonable doubt the absence of heat of passion when "the defendant is charged with premeditated murder and sufficient evidence is adduced at trial for a jury to reasonably infer that the defendant caused the death of another person in the heat of passion." Id. at 818.
Galvan relies on our language in Auchampach analyzing the relationship between intentional murder, premeditated murder, and heat-of-passion manslaughter. Specifically, Galvan calls our attention to language suggesting that if a defendant acted with premeditation, but "also acted in the heat of passion, the defendant is guilty of only first-degree manslaughter." Id. at 817.
Galvan notes that we again used similar language in State v. Quick , 659 N.W.2d 701, 711 (Minn. 2003) (citing Auchampach , 540 N.W.2d at 817 ), suggesting that a defendant who kills with premeditation is guilty only of first-degree heat-of-passion manslaughter if the defendant also acted in the heat of passion. Galvan contends that the language in both opinions suggests that premeditation and heat of passion can coexist.
Galvan argues that the language in Auchampach and Quick is inconsistent with our holdings in Cooper and Chavez-Nelson because those cases held that a defendant was not prejudiced when the district court did not instruct the jury on first-degree heat-of-passion manslaughter. The logic of Galvan's argument is simple: if heat of passion and premeditation can coexist and the jury is not instructed on heat of passion, the defendant is prejudiced. We agree with Galvan that Auchambach and Quick are inconsistent with Cooper and Chavez-Nelson .
Examining our case law and relevant scholarly authority, however, it is clear that Auchampach and Quick incorrectly suggested that premeditation and heat of passion may simultaneously exist. To the extent that Auchampach and Quick stand for the proposition that a defendant can simultaneously have the mental states of premeditation and heat of passion, we overrule both decisions.[3] We hold that the mental states of premeditation and heat of passion cannot coexist.
The two mental states are mutually exclusive because first-degree premeditated murder requires the deliberation of a "cool mind that is capable of reflection" and the premeditation of a "cool mind [that] did in fact reflect, at least for a short period of time before [the] act of killing." LaFave & Scott, supra , § 7.7(a). On the other hand, an intentional killing in the heat of passion occurs when the defendant's state of mind before and during the killing was of "rage" or "wild desperation." Id. § 7.10(a). In fact, acts that support an inference of premeditation demonstrate that the passion had cooled before the killing. See id. § 7.10(e)-(f).
Historically, heat-of-passion manslaughter was defined as an intentional killing without malice aforethought. See 2 Joel P. Bishop, Bishop's New Criminal Law §§ 695, 697(1)-(3) (8th ed. 1892). Murder and manslaughter in the heat of passion were described as mutually exclusive. Id. "Passion and malice are deemed inconsistent motive-powers; so that if an act proceeds *674 from the one, it does not also from the other." Id. § 697(1). A defendant who killed with malice aforethought was in a state of mind "under the sway of reason." Id. In contrast, manslaughter in the heat of passion "is committed suddenly, without reflection, and repels the supposition that it is the result of premeditation or a prearranged plan to kill." 1 Ronald A. Anderson, Wharton's Criminal Law and Procedure § 274 (1957).
In State v. Hoyt , we examined the boundaries between an intentional murder with premeditation, an intentional murder in the heat of passion, and an intentional murder. 13 Minn. 132, 144-49 (1868). We said that "intentional" and "premeditated" were not synonymous and that "the latter involv[es] a greater degree of deliberation and forethought." Id. at 149. We said that manslaughter was an intentional killing in the heat of passion "without premeditation." See id. ; cf. State v. Shippey , 10 Minn. 223, 229 (1865) (explaining the difference between heat-of-passion manslaughter and intentional murder). As our case law and the scholarly authority demonstrate, our decision here is consistent with both legal theory and practice. We simply restate the long-established, uncontroversial proposition that premeditation and heat of passion cannot coexist.
B.
Because the district court instructed the jury on second-degree intentional murder and first-degree premeditated murder and the jury found Galvan guilty of first-degree premeditated murder, we hold that Galvan was not prejudiced when the district court declined to instruct the jury on first-degree heat-of-passion manslaughter. See Chavez-Nelson , 882 N.W.2d at 591 ; Cooper , 745 N.W.2d at 194.
Because we hold that the district court's decision not to instruct the jury on heat-of-passion manslaughter was not prejudicial, we need not consider whether the evidence, when viewed in a light most favorable to Galvan, supported a first-degree heat-of-passion manslaughter instruction. But we reiterate that, when the evidence warrants a lesser-included-offense instruction, a court must instruct the jury accordingly. Dahlin , 695 N.W.2d at 597.
CONCLUSION
For the foregoing reasons, we affirm.
Affirmed.
THISSEN, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

The circumstantial evidence establishing premeditated murder of Alvarez is stronger than the circumstantial evidence supporting the premeditated murder of Tallman. That said, we conclude that the evidence is sufficient to establish the premeditated murder of both victims.

Galvan asserts that Cooper did not cite any authority for the proposition that a defendant is not prejudiced when the jury has found premeditation. In fact, there is authority for that proposition. In State v. Lee , 282 N.W.2d 896, 899-900 (Minn. 1979), we found no prejudice when the district court denied a defendant's request for a heat-of-passion manslaughter instruction, the court instructed the jury on second-degree and first-degree premeditated murder, and the jury found the defendant guilty of first-degree premeditated murder. Notably, the statutes defining premeditation and first-degree premeditated murder have not changed since Lee was decided. Compare Minn. Stat. § 609.18 and Minn. Stat. § 609.185(a)(1), with Minn. Stat. § 609.18 (1976) and Minn. Stat. § 609.185(1) (1976).

In neither case would the disposition have been different. In Quick , the court held that there was insufficient evidence to support a heat-of-passion manslaughter instruction. See 659 N.W.2d at 712. In Auchampach , the court held that the jury instructions as a whole adequately described the burdens of proof. 540 N.W.2d at 818.