IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,481

STATE OF KANSAS,
*Appellee*,

v.

DONNELL STAFFORD,
*Appellant*.

SYLLABUS BY THE COURT

1.

When the facts demonstrate a criminal defendant could have formed premeditation after an initial confrontation, but before the final blow, a premeditation instruction may explain that premeditation does not have to be present before a fight, quarrel, or struggle begins.

2.

Mere words cannot constitute sufficient provocation for a heat of passion voluntary manslaughter instruction, even if those words solicited murder. "Mere" does not bear on the gravity of the words, but on the fact that words alone are always insufficient to justify a lesser included instruction for voluntary manslaughter.

3.

Hearsay exceptions are not relevant to the merits of a Confrontation Clause challenge. Instead, a court must determine whether the challenged out-of-court statements were testimonial in nature and whether the criminal defendant was deprived of the ability to cross-examine beforehand.

Appeal from Sedgwick District Court; FAITH A.J. MAUGHAN, judge. Opinion filed December 23, 2020. Affirmed.

*Kasper Schirer*, of Kansas Appellate Defender Office, was on the brief for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Donnell Stafford directly appeals his premeditated first-degree murder and two cruelty to animals convictions. Stafford alleges the district court erred when it included additional language in his premeditation instruction, failed to instruct the jury on heat of passion voluntary manslaughter, admitted allegedly impermissible hearsay evidence, and claims cumulative error. Finding no error, we affirm the district court.

### FACTUAL AND PROCEDURAL BACKGROUND

Leuh Moore's body was found on April 8, 2018, in a dumpster behind two Wichita businesses. The dumpster also contained a bloody McDonald's employee polo shirt and a bloody black door mat draped over the body. Home security footage from the home behind the businesses depicted a Jeep Grand Cherokee enter the alleyway between the house and shops at approximately 4:33 a.m. A large male was seen in the footage carrying Moore's body from the SUV to the dumpster, removing a black mat, taking his shirt off, and placing those items in the dumpster. Someone found Moore's body later that afternoon. An autopsy revealed fatal stab wounds to Moore's neck, evidence of strangulation, sharp force injuries to Moore's head and neck, and incised wounds to fingers on Moore's left hand.

Moore owned a 1998 Jeep Grand Cherokee. She had previously obtained protection orders against Stafford. The protection from abuse orders alleged Stafford strangled Moore, placed a knife to her throat, and threatened to kill her. Stafford worked at McDonald's until the week or two before Moore's death.

In the front yard of Moore's duplex police found blood, a bloody women's shirt, and blood on the front porch railing and front door. They observed a visible outline from a missing doormat in front of the door. Clumps of hair dotted the living room floor and blood was present throughout the living room and kitchen. Two pit bull dogs sat in stacked cages, were covered in blood, and suffered stab wounds to their bodies. A third pit bull roamed the house unharmed. The bedroom contained more blood and a cut mattress with several visible handprints. A wooden-handled serrated blade knife lay on the nightstand.

Investigators tracked Stafford to Nebraska, and then to Davenport, Iowa, using his cell phone. Iowa authorities arrested Stafford at a motel with Moore's stolen Jeep Grand Cherokee, which contained blood. A pawn shop receipt showed Stafford pawned a television on April 8, 2018, for money shortly after Moore's death.

The Iowa intake officer asked Stafford if he was married. Stafford smirked, paused, and asked the officer if he had his file. The officer replied he did not. Stafford told the intake officer "he had killed his wife in Wichita, which is why he was under arrest in Davenport" and added he is "usually a very laid-back guy" and "likes to read his Bible," but "didn't know why he did it, he just snapped."

At trial, Moore's son, I.M., testified he woke up the night of April 7 to the dogs fighting. Stafford told I.M. to go back to sleep, and I.M. did. Stafford later took I.M. to I.M.'s grandmother's house, and as Stafford led I.M. from the house, I.M. saw a "lot of blood." I.M. also described domestic violence between "Donterio," who I.M. identified as

3

Stafford, and Moore. Donterio is Stafford's middle name. I.M.'s grandmother explained that Stafford brought I.M. over around 7:30 a.m. on April 8, 2018. Stafford told I.M.'s grandmother he had to work and would pick I.M. up around 4:00 p.m., but never returned.

Dr. Tiffany Warren, a forensic nurse, testified she met with Moore on May 23, 2017, after Stafford assaulted Moore. Dr. Warren testified Moore told her Stafford slapped, choked, hit her, sat on top of her, and threatened to kill her on several occasions. Moore passed out several times from being choked and Stafford used a jagged edged knife during one of the altercations. Dr. Warren's testimony included direct quotes from Moore.

The State admitted an email chain between Stafford and Moore from May 27, 2017, to June 20, 2017, while Stafford was in jail. Stafford and Moore argued about money and the poor status of their marriage. Stafford also warned she was "'still going to get [hers]'" and accused Moore of "sleeping around."

A jury convicted Stafford of first-degree murder and two counts of cruelty to animals. See K.S.A. 2016 Supp. 21-5402(a)(1); K.S.A. 2016 Supp. 21-6412(a)(1), (b)(1). The district court sentenced Stafford to a hard 50 sentence for the murder conviction and two concurrent 12-month sentences for the animal cruelty convictions. Stafford directly appeals.

DISCUSSION

Stafford raises four claims of error. He argues (1) the district court erred when it expanded the standard premeditation PIK instruction; (2) the district court failed to instruct the jury on heat of passion voluntary manslaughter; (3) the district court

4

impermissibly admitted hearsay evidence; and (4) cumulative error. Finding no error, we affirm.

*The district court did not err when it included additional language in the premeditation instruction.*

Stafford claims the district court erred when it included several additional paragraphs in the standard premeditation PIK instruction. The jury received jury instruction No. 9, which provided the elements for first-degree murder and defined premeditation, including the italicized additional language:

> "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous intentional act of taking another's life.
>
> *"Premeditation is the process of thinking about a proposed killing before engaging in homicidal conduct.*
>
> *"Premeditation does not have to be present before a fight, quarrel, or struggle begins. Premeditation is the time of reflection or deliberation. Premeditation does not necessarily mean that an act is planned, contrived or schemed beforehand.*
>
> *"Premeditation can be inferred from other circumstances including: (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, or (5) dealing of lethal blows after the deceased was felled and rendered helpless.*
>
> *"Premeditation can occur during the middle of a violent episode, struggle or fight."* (Emphasis added.)

Stafford recognizes this instruction is cut straight from *State v. Bernhardt*, 304 Kan. 460, 464-65, 472, 372 P.3d 1161 (2016), in which we upheld the same language. Stafford distinguishes *Bernhardt* by pointing out that the *Bernhardt* victim died from a series of blows inflicted over a long time period—warranting a clarification in the PIK. Stafford argues a single injury—a knife wound to the neck—caused Moore's death, so clarification was unnecessary.

Stafford believes this court should adopt Chief Justice Luckert's or Justice Johnson's dissenting opinion in *Bernhardt* arguing the paragraphs are confusing and therefore legally inappropriate. See 304 Kan. at 483-89 (Johnson, J., dissenting); 304 Kan. at 489 (Luckert, J., dissenting). He concludes the State cannot show the error was harmless because trial evidence suggested Moore's killing was not premeditated. Stafford directs us to his law enforcement interview where he said "he just snapped."

> "When analyzing jury instruction issues, we follow a three-step process:
> '(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal;
> (2) considering the merits of the claim to determine whether error occurred below; and
> (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.'" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

Whether a party has preserved a jury instruction issue affects our reversibility inquiry at the third step. 307 Kan. at 317; see K.S.A. 2019 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous."). At the second step, we consider whether the instruction was legally and factually appropriate. 307 Kan. at 318. Appellate courts use unlimited review to determine whether an instruction was legally appropriate. *State v. Johnson*, 304 Kan. 924, 931, 376 P.3d 70 (2016). Courts must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the

6

requesting party, that would have supported the instruction. *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016). We do not consider "whether . . . an instruction would have been factually appropriate" if the instruction is not legally appropriate. *State v. Broxton*, 311 Kan. 357, 363, 461 P.3d 54 (2020) (refusing to reach factual appropriateness after finding an instruction was not legally appropriate).

Stafford objected to the instruction below, so any error is reversible if there is a reasonable probability the error affected the outcome of the trial in light of the entire record. *State v. Louis*, 305 Kan. 453, 457-58, 384 P.3d 1 (2016).

We hold the instruction was legally appropriate. As Stafford admits, the instruction's language is pulled straight from *Bernhardt*. The *Bernhardt* court approved the additional verbiage as "correct statements of Kansas law." *Bernhardt*, 304 Kan. at 472; see also *State v. Stanley*, 312 Kan. ___ (No. 120,310, this day decided), slip op. at 9-11 (discussing legal appropriateness of the *Bernhardt* instruction in detail). Moreover, we have reaffirmed the *Bernhardt* jury instruction language. See *State v. Wright*, 307 Kan. 449, 459, 410 P.3d 893 (2018) ("Our decision on the merits of this claim is controlled by our recent decision in . . . *Bernhardt* . . . . As [defense counsel] conceded, *the language is a correct statement of the law*. It was not error for the trial judge to include it in the premeditation instruction." [Emphasis added.]). The only question remaining is factual appropriateness.

We find the additional language was factually appropriate. Stafford emphasizes a single stab wound to Moore's neck was the cause of death. He contrasts this with the multiple blows received by the *Bernhardt* victim, where each contributed to that victim's death. This somewhat mischaracterizes the *Bernhardt* analysis. The *Bernhardt* court's concern was not the presence or absence of significant physical wounds, but the presence or absence of "'a fight, quarrel, or struggle.'" *Bernhardt*, 304 Kan. at 472.

7

Under Stafford's reading, so long as the criminal actor only struck a single fatal blow, a *Bernhardt* instruction would never be appropriate. This is clearly not the result intended by *Bernhardt.* Rather, we must ask whether there exists "a possibility of jury confusion on when premeditation can or cannot occur." 304 Kan. at 470. The lynchpin of *Bernhardt*'s analysis is whether premeditation "could form during or after an initial altercation." 304 Kan. at 472.

Potential for such confusion arises when the facts demonstrate Stafford could have formed premeditation *after* the initial confrontation, but *before* the fatal blow. See *Bernhardt*, 304 Kan. at 472 ("The instruction correctly informed the jury that Bernhardt did not have to premeditate Kostner's murder before pulling her out of the car and beginning to kick her.").

The facts here demonstrate jury confusion was likely. First, the physical evidence suggested a protracted struggle between Moore and Stafford spanning Moore's duplex and the front yard. Bloody clothing was recovered outside and blood was found in the front yard, on the front porch, on the porch railing, and on the front door. Inside, hair and blood was scattered throughout the living room and blood was found all over the kitchen. The two wounded pit bulls suggested at some point during the encounter, the dogs intervened on Moore's behalf. Moore's bedroom was covered in blood and cut marks were found on the mattress and mattress pad.

Moore's body also showed many injuries, despite Stafford's focus on the single fatal neck wound. Although a single stab wound *caused* Moore's death, the autopsy revealed she suffered several stab wounds to the neck. Further, there was evidence of strangulation, sharp force injuries to Moore's head and neck, defensive wounds on Moore's left hand fingers, and her legs bore "visible injuries" and many lacerations.

The physical evidence suggests a significant struggle lasting a substantial period of time and alone is sufficient to cause a juror to wonder what Kansas law has to say about the temporal aspects of premeditation. The instruction was factually appropriate and the district court did not err.

*The district court did not err when it failed to instruct the jury on heat of passion voluntary manslaughter.*

Stafford requested a heat of passion voluntary manslaughter instruction in his proposed instructions and at the jury instruction conference. The district court denied this request as not factually appropriate. Stafford alleges reversible error, claiming there are sufficient facts to require such an instruction. Stafford points to his taped interview where he told detectives he "snapped" after overhearing Moore on the phone with a hitman. He argues the jury could have concluded he caught Moore soliciting his murder, and this was sufficient provocation for a heat of passion voluntary manslaughter instruction.

We apply the same three-step framework previously discussed. See *McLinn*, 307 Kan. at 317-18 (describing a three-step analysis: [1] preservation, [2] merits—including legal and factual appropriateness, and [3] reversibility).

The State agrees a voluntary manslaughter instruction would have been legally appropriate because "[v]oluntary manslaughter is a lesser included offense of first-degree premeditated murder." See *Bernhardt*, 304 Kan. at 475. We proceed to factual appropriateness.

For an instruction to be factually appropriate, "'there must have been evidence that would reasonably justify a conviction of the lesser included crime.'" 304 Kan. at 375 (quoting *State v. Story*, 300 Kan. 702, 710, 334 P.3d 297 [2014]). This evidence must be

9

borne out in the record, as this court does "not 'speculate about hypothetical scenarios.'" *Story*, 300 Kan. at 710 (quoting *State v. Wade*, 295 Kan. 916, 925, 287 P.3d 237 [2012]).

K.S.A. 2019 Supp. 21-5404(a)(1) defines heat of passion voluntary manslaughter as "knowingly killing a human being committed . . . [u]pon a sudden quarrel or in the heat of passion." The corresponding PIK instruction explains "'[h]eat of passion' means any intense or vehement emotional excitement which was spontaneously provoked from circumstances. The emotional state of mind must be of such degree as would cause an ordinary person to act on impulse without reflection." PIK Crim. 4th 54.170 (2019 Supp.).

Again, *Bernhardt* is instructive.

"'"The key elements of voluntary manslaughter under K.S.A. 21-3403 are an intentional killing and legally sufficient provocation. When reviewing whether provocation was legally sufficient, an objective test is used. 'Heat of passion' has been defined as 'any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror,' based 'on impulse without reflection.' The provocation "'must be sufficient to cause an ordinary man to lose control of his actions and his reason.'"' [Citations omitted.]

. . . .

"'"[I]n order to reduce a homicide from murder to voluntary manslaughter, there must be an adequate provocation that deprives a reasonable person of self-control and causes that person to act out of passion rather than reason. Mere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter."'" 304 Kan. at 475-76 (quoting *State v. Hayes*, 299 Kan. 861, 864-66, 327 P.3d 414 [2014]).

10

Further, the *Bernhardt* court explained "[a] sudden quarrel can be one form of heat of passion" and continued that an unforeseen dispute can constitute sufficient provocation for a heat of passion voluntary manslaughter instruction. 304 Kan. at 476 ("'The hallmark of heat of passion is taking action upon impulse without reflection.'") (quoting *State v. Hilt*, 299 Kan. 176, 194, 322 P.3d 367 [2014]).

Bernhardt argued his victim's slapping him during a dispute "was objectively sufficient provocation to warrant a voluntary manslaughter instruction." *Bernhardt*, 304 Kan. at 476. We analyzed Bernhardt's case to see if the provocation was objectively sufficient:

> "The evidence in this case—even from Bernhardt's own mouth—showed that he and Kostner began arguing while they were at the bar, and the argument continued during their car ride home. During that ride, Kostner slapped Bernhardt, and, at that point, he stopped, pulled her out of the car, and kicked her repeatedly. He then threw Kostner into the backseat of the car and began driving. After hearing Kostner's 'garbled' breathing, Bernhardt stopped the car again, put Kostner in the trunk, and continued driving until he stopped a third time and abandoned Kostner in a roadside ditch. He believed Kostner was still alive at the time." 304 Kan. at 476-77.

We characterized Bernhardt's request for a heat of passion voluntary manslaughter instruction as "problematic." 304 Kan. at 477. First, the initial argument was not sufficient provocation because mere words cannot constitute sufficient provocation. 304 Kan. at 477. Second, Bernhardt agreed that arguments akin to the one directly preceding Kostner's death were common between the pair—undercutting his "sudden" quarrel claim. 304 Kan. at 477. Third, even though Kostner slapped Bernhardt, "the slap occurred during their ongoing argument and 'mere evidence of an altercation between parties does not alone support finding sufficient provocation.' See *State v. Northcutt*, 290 Kan. 224, 234, 224 P.3d 564 (2010)." *Bernhardt*, 304 Kan. at 477. We held the instruction was not factually appropriate. 304 Kan. at 477.

11

We considered a similar claim in *State v. Johnson*, 290 Kan. 1038, 236 P.3d 517 (2010), and arrived at the same place. Of note, the *Johnson* record showed Johnson and his "victim had been discussing their situation and relationship all day." 290 Kan. at 1044. Because the quarrel was an all-day affair, it could not, by the plain meaning of the word, be "sudden." 290 Kan. at 1046. Proof of this long, low simmer included the fact Johnson already threw his wife's "'clothes out into the yard'" and "'told her son that she was leaving because she was cheating.'" 290 Kan. at 1046.

The *Johnson* court contrasted the lengthy and protracted disagreement in Johnson's case with the quarrel in *State v. Graham*, 275 Kan. 831, 69 P.3d 563 (2003). *Johnson*, 290 Kan. at 1045. Unlike Johnson's feud, *Graham*'s facts warranted a heat of passion voluntary manslaughter instruction. 290 Kan. at 1045. The *Johnson* court summarized:

> "In *Graham*, it appears that Graham's wife let it be known throughout the day in question that she was angry with Graham. Later that day, Graham ordered her into his truck, but she refused. Graham threatened her, and the victim, Crow, intervened. Graham and Crow then had an angry exchange and Graham drove off. Sometime later, Graham returned and approached Crow, cursing and saying he was going to kill him. They got into a physical altercation, resulting in Crow being stabbed. *The actual quarrel that immediately led to the murder in Graham did occur quite suddenly, and the stabbing occurred during the physical altercation that immediately followed the sudden quarrel.* The *Graham* court noted that . . . 'there was *some evidence* of "heat of passion" or "sudden quarrel." Thus, . . . the defendant was entitled to have the jury consider such evidence during its consideration of the elements of attempted second-degree murder.'" (Emphasis added.) 290 Kan. at 1045.

Relying on *Bernhardt*, *Johnson*, and *Graham*, a heat of passion voluntary manslaughter instruction was not factually appropriate in this case. The record does not provide "'evidence that would reasonably justify a conviction of the lesser included crime.'" See *Bernhardt*, 304 Kan. at 475. Foremost, in the videotaped interview, Stafford

12

claims he witnessed Moore plotting with a hitman for only a brief moment and again briefly when he re-summarizes the events. We find this brief mention insufficient for the burden required for the heat of passion instruction and akin to the "'hypothetical scenarios'" warned of by the *Story* court. See *Story*, 300 Kan. at 710.

Further, mere words—even if those words solicited murder—cannot constitute sufficient provocation. See *Bernhardt*, 304 Kan. at 477. Stafford argues these mere words provoked him to kill Moore:

> "Mr. Stafford told them that he had been arguing with Moore and left the house to cool down. When he returned, Mr. Stafford heard Moore on the phone, arranging to have another man kill him. . . . At that point, Mr. Stafford 'lost it' and 'snapped.' . . . He did not appreciate the gravity of his actions until the fatal wound had already been inflicted."

The State summarizes this well—"To be certain, the term 'mere' bears not on the gravity of the words themselves; rather, it means that words alone, absent more, are always insufficient to justify a lesser included instruction for voluntary manslaughter." This alone defeats Stafford's claim. See *Bernhardt*, 304 Kan. at 477.

Comparing Stafford's case to the altercations in *Bernhardt*, *Johnson*, and *Graham* strengthens this conclusion. Much like *Bernhardt*, Stafford focuses on a single tree in a much larger forest to give the illusion the quarrel between he and Moore suddenly sprung up when he allegedly heard Moore on the phone with a hitman. But, this is the same maneuver contemplated by Bernhardt, who focused on a single slap during an argument that spanned a bar visit and a lengthy car ride home. See *Bernhardt*, 304 Kan. at 476-77. Stafford explained in his interview he and Moore argued for a significant period of time, including time for Stafford to leave the house for a walk and later return to continue the argument. This clearly was not a quarrel that suddenly sprang up. See *Bernhardt*, 304

13

Kan. at 477; see also *Johnson*, 290 Kan. at 1044 (Johnson and his "victim had been discussing their situation and relationship all day.").

Stafford only mentions the hitman phone call in passing without any further elaboration. Because mere words cannot constitute sufficient provocation for a voluntary manslaughter instruction and because the record shows the quarrel between Stafford and Moore was long and protracted and did not suddenly arise, a heat of passion voluntary manslaughter instruction was not factually appropriate. Therefore, the district court did not err when it denied Stafford the instruction.

*Dr. Warren's testimony did not violate the Confrontation Clause.*

Next, Stafford argues Dr. Warren's primary motivation was to collect evidence for Stafford's later prosecution, and not to diagnose or provide Moore medical treatment. If so, Stafford alleges Moore's direct quotes were testimonial and violated the Confrontation Clause.

The Confrontation Clause's protections apply in both state and federal prosecutions. *Pointer v. Texas*, 380 U.S. 400, 406, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965). The Kansas Constitution further provides a criminal defendant the right to "meet the witness face to face." Kan. Const. Bill of Rights, § 10. Stafford's argument is "subject to a de novo standard of review because he challenges the legal basis of the trial court's admission of evidence, specifically that the evidence was admitted in violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution." *State v. Miller*, 293 Kan. 535, 555, 264 P.3d 461 (2011) (citing *State v. Dukes*, 290 Kan. 485, 487, 231 P.3d 558 [2010]).

In *Miller*, we explained the implications of *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004):

"*Crawford* held a witness' testimonial statements against a defendant are inadmissible unless the witness appears at trial or, if the witness is unavailable to testify at trial, the defendant had a prior opportunity for cross-examination. If the statements are nontestimonial, the Confrontation Clause guarantees are not implicated. Consequently, post-*Crawford*, the threshold question in any Confrontation Clause analysis is whether the hearsay statement at issue is testimonial in nature. [Citations omitted.]" *Miller*, 293 Kan. at 556-57.

We established a four-factor test to determine whether statements are testimonial:

"'(1) Would an objective witness reasonably believe such a statement would later be available for use in the prosecution of a crime?

"'(2) Was the statement made to a law enforcement officer or to another government official?

"'(3) Was proof of facts potentially relevant to a later prosecution of a crime the primary purpose of the interview when viewed from an objective totality of the circumstances, including circumstances of whether

> (a) the declarant was speaking about events as they were actually happening, instead of describing past events;

> (b) the statement was made while the declarant was in immediate danger, *i.e.*, during an ongoing emergency;

> (c) the statement was made in order to resolve an emergency or simply to learn what had happened in the past; and

> (d) the interview was part of a governmental investigation; and

"'(4) Was the level of formality of the statement sufficient to make it inherently testimonial; *e.g.*, was the statement made in response to questions, was the statement recorded, was the declarant removed from third parties, or was the interview conducted in a formal setting such as in a governmental building?'" 293 Kan. at 559 (quoting *State v. Brown*, 285 Kan. 261, 291, 173 P.3d 612 [2007]).

"Testimonial" at least "'applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations,'" but determining if statements were testimonial is often fact-intensive. See *Miller*, 293 Kan. 557-58 (quoting *Crawford*, 541 U.S. at 68.)

We momentarily address the State's claim Moore's statements could be saved by a number of hearsay exceptions. In its brief, the State emphasizes Stafford failed to challenge the district court's conclusion Moore's statements were admissible under K.S.A. 2019 Supp. 60-460(1)(1), (1)(2), and (d)(3)—the exceptions for existing state of mind, statements made for medical diagnosis, and contemporaneous statements, respectively.

This is true—Stafford does not challenge the admissibility of Moore's statements through Dr. Warren under any of those hearsay exceptions. But the operative question before us is not whether Moore's statements can be saved with statutory hearsay exceptions. We must ask whether the statements are *testimonial* in nature. See *Miller*, 293 Kan. at 557 ("Nevertheless, the fact the evidence may be admissible under a hearsay exception does not cure the confrontation problem if N.A.'s statements made to the SANE are found to be testimonial."). The State may be correct these statements would be admissible under several hearsay exceptions, but Stafford's claim may still ultimately prevail if the statements were testimonial in nature, and he was deprived the ability to cross-examine beforehand.

In *Miller*, we explained "statements made for the *sole* purpose of medical treatment, regardless of the employer of the medical professional to whom the statements

16

are made, are not testimonial." (Emphasis added.) 293 Kan. at 575-76. To determine whether a questioner solely pursued medical treatment we should ask "whether the interrogator is an agent of law enforcement charged with gathering information for purposes of trial" and examine the specific questions and responses because some questions could be interpreted as serving *either* a medical function or a law enforcement function, or *both*. 293 Kan. at 576-77. We discussed several helpful factors—including the witness' consent; whether the medical professional followed evidence-collection protocols; whether the witness or law enforcement requested the examination; and whether the witness requested information to not be shared with law enforcement. 293 Kan. at 577-78.

Stafford argues Dr. Warren acted as a state agent because she recorded Moore's statements and took photographs—actions he calls traditional investigatory tools to serve law enforcement functions. We disagree. In a pretrial motion hearing, Dr. Warren testified her employer was Via Christi Hospital in Wichita and the record is silent if any police were present during Moore's interview with Dr. Warren. Dr. Warren did not testify she collected evidence, but instead offered "comprehensive care" to "sexual assault, domestic violence, child abuse, [and] human trafficking" victims. Dr. Warren explained she took Moore's history—"[f]or the purpose of diagnoses, treating injuries, and assault related issues" and helped formulate a future safety plan. Dr. Warren said the safety plan was "part of [Moore's] treatment." At trial, Dr. Warren explained she informs her patients they do not have to talk with her and she will not interview them without their consent.

Dr. Warren never indicated she used KBI forms, or "collected evidence" in any capacity—factors important to the *Miller* court. See 293 Kan. at 578. Her pretrial motion hearing testimony indicated she believed her only role was to provide Moore with an appropriate medical history for a "holistic" medical approach and to equip Moore with tools she needed to be safe in the future. On these facts, we hold Dr. Warren was not a state agent.

17

So what was the primary purpose of the interview? See 293 Kan. at 580. According to Stafford, Dr. Warren's primary purpose was evidence collection. He again points to the photographs taken during the interview and suggests Moore's medical treatment ended before Dr. Warren's interview began. We don't agree.

The record certainly suggests a medical purpose for Moore's examination. See 293 Kan. at 580-81. Moore sustained injuries from Stafford's attack and Moore received medical evaluation and treatment for those injuries. See 293 Kan. at 581-82. The injuries Moore sustained during the first attack were extensive—Moore told Dr. Warren Stafford slapped, choked, hit, and sat on top of her. Moore blacked out from a lack of oxygen and blood flow to her brain. Stafford squeezed Moore's throat so tightly, her ability to breathe and swallow was restricted. Stafford grabbed Moore by the hair, threw her to the floor, and punched her on the head and chest. Moore certainly "suffered injuries from the attack." See 293 Kan. at 581. Dr. Warren described her role as providing treatment and comprehensive care to domestic violence victims and to help create victim safety plans.

Viewing this testimony objectively, we hold "there is evidence . . . that suggests a medical purpose to the examination." See 293 Kan. at 581. Moore's statements made through Dr. Warren were not testimonial and did not implicate the Confrontation Clause. We find no error.

*Cumulative error did not deny Stafford a fair trial.*

Stafford claims cumulative error denied him a fair trial. Because we find no error, the cumulative error doctrine does not apply. *State v. Marshall*, 303 Kan. 438, 451, 362 P.3d 587 (2015); see also *State v. Blansett*, 309 Kan. 401, 402, 435 P.3d 1136 (2019) (explaining that under the cumulative error doctrine, the court must identify "multiple errors to accumulate").

18

Affirmed.

Beier, J., not participating.

Michael E. Ward, Senior Judge, assigned.[1]

\* \* \*

Luckert, C.J., dissenting:  I dissent because I would hold the confusing and contradictory jury instruction No. 9, which defined premeditation, could have misled the jury. Specifically, the instruction could have caused the jury to understand that Donnell Stafford needed to have thought only about striking Leuh Moore with a knife before he did so, not that he needed to have formed an intent to kill her. Given this mistaken understanding, a reasonable probability exists that the erroneous instruction affected the outcome of Stafford's trial given the entire record.

My dissent stems from the erroneous wording in the premeditation instruction—not with a disagreement as to the majority's holding that Stafford could have formed premeditation *after* his confrontation with Moore began but *before* he struck the fatal blow. A reasonable jury could have relied on Stafford's testimony and concluded he at first intended to commit domestic battery without inflicting death—much as he had on prior occasions. But a reasonable jury could have also concluded a prolonged fight occurred during which violence escalated, anger grew, and Stafford's intent to cause

[1]**REPORTER'S NOTE:**  Senior Judge Ward was appointed to hear case No. 120,481 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

bodily injury short of death morphed into a design to kill that he deliberated—perhaps between assaults on Moore—before carrying out that intent.

I dissent because the instruction did not clearly explain the concept that premeditation could occur after the fight started. Instead, as I said in another case analyzing the same instruction, the "instruction was so contradictory and misleading that a lay juror could not have clearly understood premeditation." *State v. Bernhardt*, 304 Kan. 460, 489, 372 P.3d 1161 (2016) (Luckert, J., dissenting). The result is an erroneous instruction. See *State v. Horton*, 300 Kan. 477, 491, 331 P.3d 752 (2014) (citing *State v. Appleby*, 289 Kan. 1017, 1059, 221 P.3d 525 [2009]) (jury instructions must "properly and fairly state[] the law as applied to the facts of the case and . . . not have reasonably misled the jury").

Again, jury instruction No. 9 stated:

"Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous intentional act of taking another's life.

"Premeditation is the process of thinking about a proposed killing before engaging in homicidal conduct.

"Premeditation does not have to be present before a fight, quarrel, or struggle begins. Premeditation is the time of reflection or deliberation. Premeditation does not necessarily mean that an act is planned, contrived or schemed beforehand.

"Premeditation can be inferred from other circumstances including: (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the

20

occurrence, or (5) dealing of lethal blows after the deceased was felled and rendered helpless.

"Premeditation can occur during the middle of a violent episode, struggle or fight."

It is true that the instruction derives from statements in decisions of this court. But the instruction removes these statements from the context in which they were first made, and the statements often do not come with the explanations or qualifications found in the original text. Incorrect statements of law result. Plus, some of these statements contradict other portions of the instruction that give a full explanation. The instruction is thus misleading and confusing. Parsing the instruction helps explain why.

The first paragraph in the *Bernhardt/Stafford* premeditation jury instruction follows PIK Crim. 4th 54.150(d), Kansas' standard jury instruction defining premeditation. This pattern instruction—and thus this first paragraph of the *Bernhardt/Stafford* premeditation jury instruction—correctly explains that premeditation (1) means to have formed a design or intent to kill before the act and (2) requires something more "than the instantaneous, intentional act of taking another's life." So far, so good. The error arises because the rest of the instruction restates the first of these two points in ways that blurs or contradicts the meaning.

Compare two statements that make the first point of explaining that premeditation means to have formed a design or intent to kill before the act. The instruction's first paragraph makes this point by saying:  "Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act." The second paragraph of the *Bernhardt/Stafford* instruction essentially repeats the first portion of this sentence:  "Premeditation is the process of thinking about a proposed killing before engaging in homicidal conduct." But it leaves out the critical requirement

21

that this process of thinking about the killing must lead to the formation of a design or intent to kill.

Because the instruction states the principle one way in the first paragraph and another way in the second, a reasonable jury could conclude there are two paths for finding premeditation—the first where Stafford formed the intent to kill and the second where he thought about killing but rejected it. The second statement, without the critical requirement that the defendant must form a design or intent to kill, could lead a reasonable jury to conclude Stafford committed first-degree murder even though, as he testified, he did not intend to kill Moore. The instruction was thus erroneous.

To add to the confusion, the third paragraph conflicts with the statement in the first paragraph. It informed the jury:  "Premeditation does not necessarily mean that an act is planned, contrived or schemed beforehand." Compare this sentence with the first sentence of the instruction that defined premeditation as "to have formed the design or intent to kill before the act." How does a reasonable juror not well-versed in the law of premeditation reconcile a requirement that a defendant form a design to kill before committing the act with the statement that premeditation does not necessarily mean the act was planned, contrived, or schemed? As Justice Johnson stated in his *Bernhardt* dissent:  "How does one reflect or deliberate about killing the victim without planning, contriving, or scheming to kill the victim? If the defendant was not planning, contriving, or scheming to kill the victim, he or she was not premeditating the murder." *Bernhardt*, 304 Kan. at 486 (Johnson, J., dissenting).

If given context or explained, one can reconcile the two statements. The reference to "the act" in the first sentence refers to the killing—that is, to deliberating and reflecting on an intent to cause death. But the sentence in the third paragraph seems to refer to the type of act that leads to the death. At least that is the best way I can reconcile the two and that conclusion reflects distinctions in our caselaw. See *State v. Deal*, 293 Kan. 872, 885,

22

269 P.3d 1282 (2012) (discussing distinction between intent to commit a specific act and intent to cause a type of injury, such as death or great bodily harm). With an explanation that a design or intent to kill is required but that the precise mechanism of death does not have to be plotted beforehand, both statements can be correct. But the lack of context or explanation for the statement in the third paragraph could have misled Stafford's jury.

Likewise, the lack of context makes the fourth paragraph of the *Bernhardt/Stafford* instruction misleading. That paragraph states:

> "Premeditation can be inferred from other circumstances including: (1) the nature of the weapon used, (2) the lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and declarations of the defendant before and during the occurrence, or (5) dealing of lethal blows after the deceased was felled and rendered helpless.

Usually judges surround this instruction with a contextual explanation as shown in *State v. Wright*, 307 Kan. 449, 459, 410 P.3d 893 (2018), a case the majority cites to support its holding. The additional explanation more clearly conveyed that the purpose of the instruction was not to define premeditation but to explain circumstances a jury could consider when evaluating if the State had proved premeditation. 307 Kan. at 455-56.

Here, the judge placed the five circumstances in the middle of an instruction that defined premeditation. While the language was sufficient to explain to one with a law degree the limited purpose of the circumstances, the purpose would not have been apparent to the average reasonable juror. The instruction thus could have misled the jury to believe that the circumstances defined premeditation as opposed to describing the type of evidence that could show whether Stafford had formed a design or intent to kill Moore before he stabbed her in the neck and caused her death. In other words, given the fifth circumstance, the jury could have believed Stafford deliberated the intent to kill Moore after he stabbed her in the neck.

For these reasons, I would hold that the premeditation instruction was erroneous.

Having reached that conclusion, I must determine whether this error required reversal. Stafford objected to the instruction, which means the error is reversible if there is a reasonable probability the error affected the outcome of the trial given the entire record. *State v. Louis*, 305 Kan. 453, 457-58, 384 P.3d 1 (2016); see K.S.A. 2019 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous."). I conclude this reasonable probability exists.

When Stafford first discussed the incident with law enforcement, he said that "he just snapped." He later told detectives that he went into a rage when he heard his wife on the phone plotting to have him killed. In other words, his testimony suggested he acted impulsively and without reflection. While I recognize there is substantial evidence supporting premeditation, a reasonable probability the error affected the outcome of the trial arises because of the second paragraph in the instruction. There is a reasonable probability that this portion of the instruction led the jury to conclude Stafford committed first-degree murder based on a premeditated intent to stab Moore, even though, as he testified, he did not intend to kill her. The lack of explanation and context accompanying other statements in the instruction would not have countered this misstatement but only added to the confusing morass of words the jury had to fight through.

Stafford is entitled to a new trial in which a clear instruction guides the jury.