STATE OF MINNESOTA

IN SUPREME COURT

A22-1372

<table>
<tr><td>Washington County</td><td>McKeig, J.</td></tr>
<tr><td></td><td>Concurring, Chutich, McKeig, Moore, III, Procaccini, JJ.</td></tr>
<tr><td></td><td>Took no part, Hennesy, J.</td></tr>
<tr><td>McKinley Juner Phillips,</td><td></td></tr>
<tr><td>Appellant,</td><td></td></tr>
<tr><td>vs.</td><td>Filed: June 12, 2024</td></tr>
<tr><td></td><td>Office of Appellate Courts</td></tr>
<tr><td>State of Minnesota,</td><td></td></tr>
<tr><td>Respondent.</td><td></td></tr>
</table>

_____

Cathryn Middlebrook, Chief Appellate Public Defender, Susanne M. Senecal-Hill, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Kevin Magnuson, Washington County Attorney, Andrew T. Jackola, Assistant Washington County Attorney, Stillwater, Minnesota, for respondent.

_____

S Y L L A B U S

The appellant was not prejudiced by the district court's refusal to instruct the jury on first-degree heat-of-passion manslaughter because the jury was presented with instructions for first-degree premeditated murder and second-degree intentional murder and found the appellant guilty of first-degree premeditated murder.

Affirmed.

1

MCKEIG, Justice.

A jury found appellant McKinley Juner Phillips guilty of first-degree premeditated murder and second-degree intentional murder for the stabbing death of his wife, Shavon Phillips. The district court convicted Phillips of first-degree premeditated murder and imposed a sentence of life imprisonment without the possibility of release. Phillips had conceded at trial that he caused the death of Shavon,[1] but had requested that the jury be given instructions for first-degree heat-of-passion manslaughter in addition to the instructions for first-degree premeditated murder and second-degree intentional murder. The district court denied the requested instruction, reasoning that even when the evidence was viewed in a light most favorable to Phillips, it did not support a heat-of-passion instruction. On appeal, Phillips argues that the district court committed reversable error by denying the requested instruction. We have no need to reach the issue of whether the district court's denial was proper or erroneous. Instead, because we conclude that Phillips was not prejudiced by the district court's denial of the requested first-degree heat-of-passion manslaughter jury instruction, we affirm.

**FACTS**

In June 2021, Phillips got into an argument with his wife, Shavon, punched her in the face, and then stabbed her 27 times, which resulted in her death. In the week leading up to the killing, Phillips performed numerous internet searches on his phone on topics

---

[1] Because Phillips shares a last name with Shavon, the victim's first name is used for clarity.

which included: the cost of divorce in Minnesota, what to do if only one spouse wants a divorce, signs that a spouse is cheating, and "how do you know if your wife is talking to another man in prison." He also visited an online newspaper article titled "Man gets 51 Years in Beating Death of Mother and Son in Ottertail County" on the day immediately preceding the killing.

At around 7 a.m. on the day of the murder, Shavon picked up Phillips from work and drove him home, where he checked on the children[2] and poured himself an alcoholic drink. Sometime between 8 and 9 that morning, Phillips discovered an envelope in Shavon's purse containing a visitation form that had been sent to Shavon by A.J., an inmate at a Michigan prison. Phillips admitted that when he found the envelope, he "was getting kind of [angry]." At 10:25 a.m., Phillips searched the internet for A.J.'s mug shots, and the results showed that A.J. had been sentenced in 2005 and was serving a life sentence. Sometime after this, Phillips "got up a nerve to say something" to Shavon about the visitation form. In response, she told him, "I do what the f-ck I want to do," and that she could have raised the children herself without Phillips' help. Phillips then asked Shavon to take him to the liquor store, but she refused and went downstairs. Phillips replied, "I'm sick of this sh-t" and followed her down to the basement.

At 12:37 p.m., Phillips told the children who were in their basement bedrooms to go upstairs to watch TV—first the girls, and then the boys—and Phillips followed the boys to make sure all the children were upstairs. At that point, Phillips told the boys, "You

---

[2]    Phillips shared one biological son with Shavon; five other children also lived in the house.

better spend time with your brother while you can." The TV the children were watching was attached to large speakers which were "always" turned up to very loud volumes. Shortly after Phillips sent the children upstairs, Shavon went into the laundry room, which is connected to a basement TV room.

At 12:50 p.m., Phillips entered the laundry room and began "talking" with Shavon, which "ended up being an argument." Phillips "didn't go in there to argue," but he knew that by following his wife into the laundry room, an argument would occur. They began arguing, and during the argument, Phillips again went upstairs to check on the children and to make sure they could not hear any noise from the basement. When he returned, both he and Shavon were in the basement TV room, sitting on a couch and an armchair, respectively, and the argument continued. Phillips asked Shavon how she could do this to him because he thought they were a team, and she told him that she had cheated on him. After hearing this, Phillips inquired into the reason behind his son's middle name—which was the same as inmate A.J.'s middle name—and Shavon replied that she had been "thinking about [A.J.] the whole time." Shavon told Phillips that he "ain't f-cking right" and that she wanted to go back to Detroit so A.J. could "bounce [her] ass like he used to." Phillips took this as a challenge to his manhood.

Phillips then began pacing around the basement TV room. He told Shavon that he hated her; she replied that she hated him too, adding "if you hate me, then you can get

the—."[3]  Before Shavon could finish her last sentence, Phillips "punched her like two or three times."  When Phillips punched Shavon—who was sitting down at the time—he struck her in the eye and jaw area, which an autopsy showed had caused a brain injury.  He then grabbed a folding knife, either from his pocket or a nearby table.  He stabbed Shavon, first in her arms, then in her hands as she tried to block the attack, and then in her chest until she fell facedown from the chair onto the floor.  As Shavon lay on the ground, Phillips continued to stab her until the blade of the knife he was using folded, cutting his hand.  Phillips then grabbed a different knife and continued stabbing Shavon in the back as she lay prone on the ground.

After stabbing Shavon a total of 27 times, Phillips fell back into the doorway crying and said, "what the f-ck did I just not [sic] do."  He then brought the two knives used in the attack to the laundry room and rinsed and taped his hand to stop the bleeding.  Phillips went upstairs and told the children that Shavon had gone to play bingo and told his biological son that he would probably never see him again.  At the time of the killing, Phillips had $379 in cash on his person, as well as his social security card, birth certificate, and insurance card, Shavon's ID card and debit card, and some prepaid debit cards.  Phillips then left the home, texted his mother that he was going to turn himself in, and searched the internet for information on homicide charges.  Rather than turning himself in, Phillips went to a bar and then eventually boarded a Greyhound bus going to Chicago, "to start over"

---

[3]     At different points in his testimony, Phillips states that Shavon would have finished the sentence with " . . . get the f-ck out," or " . . . get your sh-t."  Either way, Phillips was under the impression that Shavon was telling him he was free to leave if he so wished.

with "a trouble free life" in Chicago or New York City. Phillips was arrested on the bus before it reached Chicago.

A grand jury indicted Phillips with first-degree premeditated murder and second-degree intentional murder for killing Shavon. Prior to the presentation of cases and as part of his trial strategy, Phillips conceded that he caused the death of Shavon. Phillips then requested a first-degree heat-of-passion manslaughter instruction be given to the jury. The district court denied the request and instructed the jury on only first-degree premeditated murder and second-degree intentional murder. The jury subsequently found Phillips guilty of first-degree premeditated murder and of second-degree intentional murder.

### ANALYSIS

Phillips argues that the district court committed reversible error by refusing to instruct the jury on first-degree heat-of-passion manslaughter. *See* Minn. Stat. § 609.20(1) (2022). The denial of a lesser-included offense instruction is reviewed for abuse of discretion, but when a lesser-included offense instruction is warranted by the evidence, "the trial court *must* give it." *State v. Dahlin*, 695 N.W.2d 588, 597 (Minn. 2005). When considering a requested lesser-included offense instruction, the district court must view the evidence in the light most favorable to the requesting party and must not make its own credibility or strength-of-evidence determinations. *Cooper v. State*, 745 N.W.2d 188, 193-94 (Minn. 2008). However, a district court's denial of a requested lesser-included instruction is reversible error only when the instruction is warranted *and* a defendant is actually prejudiced by the error. *State v. Chavez-Nelson*, 882 N.W.2d 579, 591 (Minn. 2016) (citing *Dahlin*, 695 N.W.2d at 597). In other words, even if the trial court erred by

6

denying a requested lesser-included offense instruction, reversal is appropriate only if the defendant was prejudiced by the error.

When deciding whether a defendant was prejudiced by the court's failure to give a requested lesser-included offense instruction, we consider "the [jury] instructions actually given and the verdict rendered by the jury." *Dahlin*, 695 N.W.2d at 599. Moreover, we have consistently held that a defendant is not prejudiced by a district court's failure to give a heat-of-passion manslaughter instruction if the jury was presented with both first-degree premeditated murder and second-degree intentional murder, and subsequently finds the defendant guilty of first-degree premeditated murder. *See, e.g.*, *State v. Galvan*, 912 N.W.2d 663, 672 (Minn. 2018); *Chavez-Nelson*, 882 N.W.2d at 591; *Cooper*, 745 N.W.2d at 194. This is due to our determination that "the mental states of premeditation and heat of passion cannot coexist" because of the dissimilar mental states required to commit either type of crime. *Galvan*, 912 N.W.2d at 673. Premeditation requires a finding of a cool mind and some reflection before the killing, whereas heat-of-passion requires a finding of rage or wild desperation before the killing. *Id.* (citation omitted).

Phillips claims that he is not arguing that *Galvan* was wrongly decided, nor that premeditation and heat of passion may exist simultaneously. Rather, he argues that it cannot be true in *every* case that a defendant is not prejudiced by a district court's refusal to instruct on heat-of-passion manslaughter if the jury finds the defendant guilty of first-

7

degree premeditated murder.[4]  But this argument misses the point of our previous decisions.  Our decision in *Chavez-Nelson* presented the same situation as this case: "[t]he jury was presented with charges of first-degree premeditated murder and second-degree intentional murder," the district court "declin[ed] to instruct the jury on the lesser-included offense of first-degree heat-of-passion manslaughter," and the defendant "was found guilty of all counts."  *Chavez-Nelson*, 882 N.W.2d at 584, 592.  We determined that these circumstances were "analogous to *Cooper*," where we reasoned:

> Because the jury had the choice of finding [the defendant] guilty of intentional murder *without* premeditation (i.e., second-degree murder), but instead found [the defendant] guilty of intentional murder *with* premeditation, this verdict indicates that the jury would not have found [the defendant] guilty of first-degree manslaughter, which requires an intent triggered by the heat of passion but no premeditation.

*Chavez-Nelson*, 882 N.W.2d at 592 (quoting *Cooper*, 745 N.W.2d at 194).  The lack of prejudice does not spring merely from a jury's finding of premeditation, but from a finding of premeditation coupled with an opportunity to find guilt *only* of a killing *without* premeditation.  This jury had such an opportunity and returned a guilty verdict on both counts.  As we explained in *Chavez-Nelson*, "[t]he jury's decision to find [the defendant] guilty of first-degree premeditated murder demonstrates that the jury would not have

---

[4]    Phillips bases this claim on the theory that "in the jurors' minds, there is [likely] very little distinction between first-degree premeditated murder and second-degree intentional murder."  Phillips seems to implicitly challenge the adequacy of the jury instructions given at his trial regarding the elements of first- and second-degree murder.  The adequacy of those instructions is not at issue in the case before us and we decline to address it.

acquitted [the defendant] of first-and second-degree murder and instead found him guilty of first-degree manslaughter." *Id.* The same conclusion is compelled here.

We hold that Phillips was not prejudiced by the district court's decision not to instruct the jury on first-degree heat-of-passion manslaughter because the court gave instructions on both first-degree premeditated murder and second-degree intentional murder and the jury found Phillips guilty of first-degree premeditated murder. Because the district court's denial of the requested instruction was not prejudicial, we need not consider whether the evidence—viewed in the light most favorable to Phillips—supported a first-degree heat-of-passion manslaughter instruction.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the district court.

Affirmed.


HENNESY, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

9

CONCURRENCE

CHUTICH, Justice (concurring).

I agree with the court that, consistent with our established precedent, McKinley Juner Phillips was not prejudiced by a denial of heat-of-passion manslaughter jury instructions because the jury found premeditation after being instructed on counts of premeditated murder and murder without premeditation. Accordingly, I join the majority opinion. I write separately, however, to note that, if the court did need to reach the issue, I believe that a strong argument exists that the district court correctly denied the request for a heat-of-passion jury instruction. I also believe that it is time for the Minnesota Legislature to update the anachronistic heat-of-passion defense to preclude its use when words alone are the alleged provocation to an intentional killing.

A.

First, although the court need not decide whether the district court erred when it denied the requested heat-of-passion jury instruction, I observe that it is not readily apparent that any such error was made. First-degree heat-of-passion manslaughter is a lesser-included offense of intentional murder. *Compare* Minn. Stat. §§ 609.185(a)(1), (3), (4) (2022), 609.19, subd. 1(1) (2022) (causing the death of a human being with intent to cause death), *with* Minn. Stat. § 609.20(1) (2022) (causing the death of a human being with intent to cause death after adequate provocation). A district court's denial of a lesser-included offense instruction is reviewed for abuse of discretion. *See Troxel v. State*, 875 N.W.2d 302, 310 (Minn. 2016).

C-1

When a district court considers whether to instruct the jury on heat-of-passion manslaughter, it must look at the evidence in the light most favorable to the requesting party and ask whether a rational basis exists to acquit of the offense charged and convict on the lesser-included offense. *State v. Dahlin*, 695 N.W.2d 588, 598 (Minn. 2005). When making this determination, the court "may not weigh the evidence or make credibility determinations." *Id.* To mitigate an intentional killing to heat-of-passion manslaughter, the defendant's "passion" must have been "provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances," which is an objective standard. *State v. Johnson*, 719 N.W.2d 619, 627 (Minn. 2006) (quoting *State v. Brocks*, 587 N.W.2d 37, 41 (Minn. 1998) (internal quotation marks omitted).

Here, the district court said that "the alleged heat of passion . . . was not provoked by any sort of word or act that would provoke a person of ordinary self-control under similar circumstances." The evidence—taken in the light most favorable to the defendant—shows that Phillips had suspected spousal infidelity for some time and had already contemplated divorce, and further, that he was the one to engage and *reengage* in the argument that led to Shavon's death. Of course, the argument was emotionally charged as so many arguments are when a spouse ponders divorce or infidelity. Ultimately, Phillips told Shavon that he hated her, and she responded in kind, attempting to add that if he hated her, he was free to leave. But she was never allowed to finish that thought, because after hearing that his hate was reciprocated, Phillips punched his wife so hard that it caused a brain injury, and then he stabbed her to death. Shavon had never even risen from her

armchair, yet Phillips claims that Shavon's words were enough to provoke a person of ordinary self-control into a murderous rage.

Without deciding the issue, I observe that a compelling argument exists that rather than abusing its discretion, the district court wisely refused to give the heat-of-passion instruction. It reasoned that if it did give one in this case, it would have to find that someone saying to their husband to get his things and leave during an argument "is enough to weaken someone's willpower and cloud their reason to the point where a Manslaughter instruction would be required."

B.

In my view, it should go without saying that a husband being verbally kicked out of the house by his wife is insufficient provocation for her to be beaten and stabbed to death, however spiteful her words. That this argument is even made today is reflective of too slowly changing societal norms and of our court's outdated case law.

Phillips cites a nearly 50-year-old decision by this court for the proposition that a bitter domestic argument coupled with the imminent end of a marriage should be enough to allow a jury to decide whether heat-of-passion existed. *See State v. Leinweber*, 228 N.W.2d 120, 124 (Minn. 1975). In *Leinweber*, this court found that the defendant was prejudiced by a trial court's failure to instruct the jury on heat-of-passion manslaughter—an instruction that the defendant's own testimony repudiated. *Id.* at 123-25. There, the court found that the district court should have included the instructions because it was the jury's job to reconstruct "the facts of the tragedy," and the jury could have inferred from the evidence that the defendant shot his wife in the heat of passion. *Id.*

C-3

at 123-24. The evidence included testimony about heated arguments that followed the defendant's frequenting of bars, the victim loudly berating the defendant in public for taking her 11-year-old son to a bar, the victim visiting a divorce lawyer, and the victim's dying curses toward the defendant after he shot her. *Id.* at 124. Tellingly, the court highlighted evidence that the "decedent had a loud and vulgar tongue and frequently castigated [the] defendant in vile terms." *Id.*

It seems outlandish today to suggest that a "loud and vulgar" wife—using just her words—could provoke a husband of ordinary self-control to kill her. After all, *Leinweber* was decided at a time when some states still denied women the right to serve as jurors or to dispose of community property. *See Taylor v. Louisiana*, 419 U.S. 522, 538 (1975) (juries); *Kirchberg v. Feenstra*, 450 U.S. 455, 457 (1981) (property). But *Leinweber* is still good law,[1] and its subtext is chilling. Explicitly, if a wife is too verbally cruel to her husband as their marriage ends, a husband may be excused if his "reason is clouded and his willpower weakened" enough to kill her. *State v. Hannon*, 703 N.W.2d 498, 510 (Minn. 2005). Loud, vulgar wives everywhere: beware.

## C.

Importantly, heat-of-passion may be provoked under Minnesota Statutes section 609.20(1) by sufficient "words *or* acts." (Emphasis added.) In the absence of ambiguity,

---

[1] "We are 'extremely reluctant to overrule our precedent under principles of stare decisis and require a compelling reason' before we will do so." *Kenneh v. Homeward Bound, Inc.*, 944 N.W.2d 222, 230 (Minn. 2020) (quoting *Daniel v. City of Minneapolis*, 923 N.W.2d 637, 645 (Minn. 2019). Here, the resolution of this appeal on the ground that Phillips was not actually prejudiced makes it unnecessary for the court to conclusively decide whether to overrule or revisit our decision in *Leinweber*.

if the Legislature uses the word "or," the term is read to only require one of the possible factual situations. *State v. Abdus-Salam*, 1 N.W.3d 871, 878 (Minn. 2024). Accordingly, words alone are legally sufficient to provoke a heat of passion to kill in Minnesota. It seems atavistic that words alone, absent some physical act of violence or peril, can be enough to provoke a person of ordinary self-control to take the life of another human being in a blind rage.[2] Phillips argues that because words alone are sufficient under Minnesota law to provoke a homicidal heat-of-passion, his emotionally fraught argument with his wife was enough for the court to instruct the jury on heat-of-passion manslaughter. Although it was not necessary for the court today to decide whether the district court properly declined to give a heat-of-passion instruction under the circumstances presented here, under the statutory language including "*words* or acts," Phillips raises a colorable argument. Because giving a heat-of-passion defense for angry, but entirely verbal domestic disputes like this one is unwarranted in 2024, it is time for the law to change.[3]

If Phillips had been allowed his requested heat-of-passion jury instruction and was convicted on that count alone, he could have been sentenced to as few as 6 years in prison for killing his wife—a very different sentence than the minimum sentence for a

---

[2] Perhaps sensing this unreasonable proposition, this court has recently said of the requirements for heat-of-passion that "the passion [must be] provoked by words *and* acts of another such as would provoke a person of ordinary self-control under like circumstances." *Eason v. State*, 950 N.W.2d 258, 264 (Minn. 2020) (emphasis added). Note, however, that in *Eason*, the victim was killed after reaching for a weapon, so the situation clearly did not involve words alone. *Id.* at 265.

[3] Note that Phillips committed intimate partner violence the moment that he punched his wife. Had he stopped his attack after punching her, no heat-of-passion defense exists for assault, and her words would be irrelevant.

conviction of intentional second-degree murder. *Compare* Minn. Sent. Guidelines 4.A, 5.A, Severity Level 9 (showing a 74-month presumptive minimum sentence for first-degree manslaughter with a criminal history score of 0), *with id.*, Severity Level 11 (showing a 261-month presumptive minimum sentence for second-degree intentional murder with a criminal history score of 0). Moreover, if an abusive husband injures his wife badly enough, he might actually be spared additional prison time if—instead of merely stopping after serious injury—he simply carries on, kills her, and cries heat-of-passion.[4] These possible sentences raise the important question of what this disparity means for domestic abusers across the state and whether, if an abuser crosses the ultimate line and kills his partner, he should be granted a heat-of-passion jury instruction simply because cruel words hurt his feelings and pushed him to anger. Under current law, an abuser could seemingly escape a murder conviction if a jury were to find sufficiently "vile" castigation from the victim. *Leinweber*, 228 N.W.2d at 124. Minnesota's heat-of-passion manslaughter statute not only does *nothing* to curb intimate partner violence, it also implicitly tells victims of abuse not to protest too loudly or crudely, else they cloud an abuser's reason and weaken his judgment enough to excuse their intentional killing.

This critical issue is one of policy, and "those issues are best directed to the Legislature." *Shefa v. Ellison*, 968 N.W.2d 818, 822 n.4 (Minn. 2022). I therefore speak now directly to the Legislature. Numerous other states do not allow words alone to mitigate

---

[4]     First-degree assault with great bodily harm, Minn. Stat. § 609.221, subd. 1 (2022), carries a statutory maximum sentence of 20 years. Heat-of-passion manslaughter, Minn. Stat. § 609.20(1) (2022), carries a statutory maximum sentence of only 15 years.

murder to manslaughter, and I urge Minnesota to join them.  *See*, *e.g.*, *State v. Stafford*, 477 P.3d 1027, 1034 (Kan. 2020) ("Mere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter." (citation omitted) (internal quotation marks omitted)); *State v. Runningeagle*, 859 P.2d 169, 178 (Ariz. 1993) ("Words alone are not adequate provocation to justify a manslaughter instruction."); *Baker v. State*, 304 So. 3d 707, 712 (Miss. Ct. App. 2020) ("Mere words, no matter how provocative, are insufficient to reduce an intentional and unjustifiable homicide from murder to manslaughter." (citation omitted) (internal quotation marks omitted)); *Smith v. Commonwealth*, 808 S.E.2d 848, 854 (Va. Ct. App. 2018), *aff'd*, 821 S.E.2d 543 (Va. 2018) ("The Commonwealth also continues to follow the common law principle that words alone are not sufficient to engender a reasonable provocation that incites passion and negates the presence of malice."); *Massey v. State*, 955 N.E.2d 247, 257 (Ind. Ct. App. 2011) ("Words *alone*, however, do not constitute sufficient provocation, especially words that are not intentionally designed to provoke.").

Numerous challenges remain in the fight against domestic abuse and intimate partner violence.  The ability for a domestic abuser to claim a heat-of-passion defense because he did not like the way his partner spoke to him should not be one of them.


MCKEIG, Justice (concurring)

I join in the concurrence of Justice Chutich.

MOORE, III, Justice (concurring)

I join the majority opinion and join in the concurrence of Justice Chutich.


PROCACCINI, Justice (concurring)

I join the majority opinion and join in the concurrence of Justice Chutich as to Parts

B and C, but not as to Part A.